# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and*
*Attorney-in-Chief*

*Eastern District*
Peter Kirchheimer
*Attorney-in-Charge*

April 5, 2017

Hon. Brian M. Cogan
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York  11201

<u>**United States v. Robin Alan Fuller, 16 CR 254 (BMC)**</u>

Your Honor:

On March 4, 2016, Robin Fuller was stopped at JFK airport after arriving on a flight from the Ukraine.  Mr. Fuller was traveling to Texas, where he expected to receive medical care at Baylor University Medical Center in Dallas.  Mr. Fuller, who suffers from several serious and debilitating medical conditions, had been receiving treatment at this hospital for years.  At JFK, law enforcement agents seized some of Mr. Fuller's electronic devices; Mr. Fuller then traveled on to Texas.  Weeks later, after discovering child pornography on some of the devices, agents arrested Mr. Fuller at the home of his friend in Texas, where Mr. Fuller had said he would be staying.

Since his arrest on March 25, 2016, Mr. Fuller has been in custody. Because of his precarious medical condition, he has spent a portion of that time in the hospital, being treated for his serious health problems.  On November 22, 2016, Mr. Fuller pleaded guilty to Count Two of the Indictment pending against him, admitting that he possessed child pornography on March 4. He is scheduled to be sentenced by this Court on April 17, 2017.

According to the presentence investigation report (PSR), Mr. Fuller faces an advisory guideline range of 135 to 168.  The defense objects to this guideline calculation. Because one guideline enhancement is based on false allegations provided to the Probation Department by Mr. Fuller's ex-wife and daughter, it cannot be applied.  The appropriate guideline calculation is the one found in the plea agreement (and stipulated to by the defendant in that agreement): a final offense level of 28 with a sentencing range of 78-97 months.

As detailed below, Mr. Fuller seeks a sentence well below the advisory guideline range based on:  (1) his serious medical conditions, which will be difficult to treat in prison and will make any time Mr. Fuller serves more burdensome than the average inmate's; (2) the nature of his criminal conduct; and (3) problems with the child pornography guideline in appropriately distinguishing between offenders, recognized by the Court of Appeals and the U.S. Sentencing Commission.

<u>Objections to the PSR</u>

| | |
|---|---|
| PSR ¶ 2: | In regards to forfeiture, Mr. Fuller has agreed to forfeit all property "used or intended to be used to commit . . . [the] offense." (Plea agreement ¶ 6). It is unclear which of the items listed at PSR ¶ 2 actually contained illegal images. Any that did not cannot be forfeited. Mr. Fuller therefore asks the government to verify which items were used to commit the offense (which will be forfeited) and return the others to him. |
| PSR ¶ 3: | Mr. Fuller did not exchange emails containing illegal images with anyone and he did not discuss traveling for the purpose of exploiting children. |
| PSR ¶¶ 4, 5: | Mr. Fuller accurately described his residence history after being stopped at JFK, including where he would be staying in Texas. He indicated that he could not stay with his wife in the Ukraine because she lived in Crimea, a region then under the control of Russia. After the Russian invasion, Mr. Fuller was no longer able to enter Crimea and had to stay elsewhere in the Ukraine. |
| PSR ¶ 8: | Prior to the guilty plea in this case, counsel reviewed images recovered from electronic items taken from Mr. Fuller on March 4, 2016. At that time, the forensic examination of the items was incomplete. Very few of the images viewed by counsel at that time appeared to meet the legal standard for child pornography (though some were obviously child pornography under the statutory definition .) The great majority of the would be better described as child erotica or even glamour images of children dressed in swimwear or underwear. The ratio of legal images to illegal images (more than 400 to 1) noted in PSR ¶ 8 is consistent with what counsel saw during his review. |
| PSR ¶ 14: | Mr. Fuller did not tell the arresting agents that he was the only male on the Crimean farm. He said that was the only male member of the family. |
| PSR ¶ 19, 23: | Mr. Fuller categorically denies sexually abusing his daughter at any time. Mr. Fuller married Ms. Zielstrof in 1979; the marriage was rocky. Ms. Zielstrof often abandoned Mr. Fuller and their daughter for months at a time. In 1989, Ms. Zielstrof abandoned the family for good. Mr. Fuller and his parents cared for the couple's daughter (and for Ms. Zielstrof's son from another relationship) after Ms. Zielstrof left the family. In 1992, Mr. Fuller obtained a divorce from Ms. Zielstrof. In 1999, after becoming pregnant at age 18, Mr. Fuller's daughter relocated to her mother's home. Mr. Fuller believes that the false charges of abuse were made because of the acrimonious relationship between him and Ms. Zielstrof. Ms. Zielstrof's animus towards Mr. Fuller is evidenced by her "corroboration" of the alleged abuse to the Probation Officer even though she and Mr. Fuller had long since divorced and lived far apart when the abuse is alleged to have occurred. |
| PSR ¶ 30: | Mr. Fuller never sexually abused any minor. This 5 level enhancement does not apply. |

PSR ¶ 51:    Mr. Fuller estranged brother, David, is alive as far as Mr. Fuller knows. Mr. Fuller has not seen him for more than a decade and they rarely speak. This estrangement has lasted for over 20 years and came at David's request.

PSR ¶ 54:    Mr. Fuller was never abusive towards Ms. Zielstrof and he never arranged for her to be arrested for domestic violence. Eric Fuller is not Mr. Fuller's son, rather he is the biological son of another man and Ms. Zielstrof, conceived while she was married to Mr. Fuller. Mr. Fuller cared for Eric after Ms. Zielstrof abandoned the family, but he moved to live with Ms. Zielstrof in or around 1997, when he was 15 years old. He was not returned to his mother because of any physical abuse.  Mr. Fuller was never removed from Mountain Home Air Force Base for impersonating a general.

PSR ¶ 55:    Mr. Fuller was never physically or sexually abusive to his daughter or to Eric.  Both children were raised by Mr. Fuller and his parents, until Mr. Fuller's father passed away in 1994 and his mother passed away in 1997. During most of those years, the children lived with Mr. Fuller's parents while he lived nearby. Mr. Fuller did not stalk Ms. Zielstrof and their daughter after the daughter went to live with her mother. At their request, he traveled to Washington State to bring the daughter's belongings. He remained in the area for a few weeks, but relocated to Nevada when it became clear to him that Ms. Zielstrof would not allow him to see his daughter. Mr. Fuller never threatened either Ms. Zielstrof or his daughter.

PSR ¶ 56:    Mr. Fuller has never had a non-driver identification issued in Arizona. He last had a driver's license in 1992; it was issued in Idaho. Mr. Fuller owned a small plot of land for a short time in Arizona City where he hoped to build a house. After his father died in 1994, the land was sold at auction for unpaid taxes.

PSR ¶ 59:    Mr. Fuller never denied being a citizen of the Ukraine when he spoke with Pretrial Services.

PSR ¶ 62:    Mr. Fuller was never married to Ms. Kane. She passed away after an automobile crash, not in a plane crash.

PSR ¶ 63:    The marriage to Ms. Molchanova was annulled after only a few months.

PSR ¶ 64:    Mr. Fuller married Ms. Savrinskaya in 2009, not 2012. Mr. Fuller could not live in Crimea after the Russian takeover and that's why he lived elsewhere in the Ukraine.

PSR ¶ 66:    Mr. Fuller was arrested in Texas on March 25, 2016 and removed in custody to the Eastern District of New York. He arrived at MDC Brooklyn early in April.

PSR ¶ 68:    Mr. Fuller has suffered from a form of muscular dystrophy since birth. His symptoms were first noted when he was 5 years old, but he was not diagnosed until 1984 at UCSD Medical Center in San Diego.  It was here that muscle biopsies revealed Mr. Fuller's muscular dystrophy.

4

| | |
|---|---|
| PSR ¶ 73: | Mr. Fuller has usually been able to walk short distances, but has needed a wheelchair for many years to travel more than a short distance. When he arrived at the hospital in Las Vegas, it was always by ambulance, so Mr. Fuller is unsure why they describe him as ambulatory. Mr. Fuller refused morphine at this hospital because he had recently had a bad reaction to the drug. He requested Dilaudid instead. |
| PSR ¶ 75: | Mr. Fuller does not recall ever being asked to undergo a muscle biopsy since he's been in custody. In any case, he likely would have refused since he has undergone such tests in the past. He did refuse to continue a nerve test because of the pain inherent in the testing procedure. |
| PSR ¶ 76: | Ms. Zielstrof's opinion of Mr. Fuller's medical condition is incorrect and irrelevant. Mr. Fuller does not recall his daughter having any health issues before she moved to be with her mother at age 18 and Mr. Fuller has been informed that his form of muscular dystrophy is not hereditary. |
| PSR ¶ 81: | Mr. Fuller has suffered from a painful form of muscular dystrophy for his entire life. He often relies on painkillers to treat his condition. Any intimation that he abused opiates is false. |
| PSR ¶ 85: | Mr. Fuller is only fluent in English. He can converse somewhat in Russian, French, and German. |
| PSR ¶ 88: | Because the cost of living in the Ukraine is far below that in the United States, Mr. Fuller was able travel back to this country for medical care several times per year using his social security payments. |

## Guideline calculation

The government and Mr. Fuller executed a plea agreement that anticipated a final offense level of 18 and a sentencing range of 78 to 97 months in criminal history category I. A condition of the plea agreement was that Mr. Fuller stipulate to the guideline calculation contained in the agreement. The PSR recommends a 5 level increase to the offense level pursuant to USSG § 2G2.2(b)(5) – an enhancement not found in the plea agreement.  As noted above, Mr. Fuller never engaged in a pattern of activity involving the sexual abuse of a minor. He never sexually abused his daughter. The burden of proving an enhancement falls on the government and the bare assertions found in the PSR are insufficient to support the requested guideline increase.

Mr. Fuller has never sexually abused anyone; he should not receive a 5 level enhancement pursuant to USSG § 2G2.2(b)(5).  The final offense level is 18 and the sentencing range is 78 to 97 months.

## 18 U.S.C. § 3553(a)

Under 18 U.S.C. § 3553(a), a sentencing court is required to impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing.  Section

3553(a)(2) states that such purposes are:

1.  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense
2.  to afford deterrence to criminal conduct:
3.  to protect the public from further crimes of the defendant; and
4.  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

To arrive at such a sentence, the Court is further directed to consider: (1) the nature and circumstances of the offense and the history and characteristics of the offender; (2) the kinds of sentences available; (3) the kinds of sentence and the sentencing range established in the Sentencing Guidelines; (4) policy statements issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities among similarly situated defendants; and (6) the need to provide restitution to any victims of the offense *See* 18 U.S.C. § 3553(a)(1).

Even though Congress envisioned that some child pornography offenses would warrant non-jail sentences, the guidelines provide for a sentence of more than 6 years for Mr. Fuller. No truly aggravating facts warrant such a sentence and numerous courts, including the Second Circuit, have indicated that the guidelines should receive less than typical weight in child pornography cases. Even the Sentencing Commission now agrees that § 2G2.2 of the Guidelines is deeply flawed. Guidelines sentences are now the notable exception in these cases.

The guideline calculation contained in the plea agreement is technically correct, however, Guideline §2G2.2 can lead to a sentence that is inconsistent with the mandates of 18 U.S.C. §3553(a). In *United States v. Dorvee*, 616 F. 3d 174, 188 (2nd Cir. 2010), the Second Circuit found that §2G2.2 is "an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." The court noted that §2G2.2 was not formulated by the Sentencing Commission using an empirical approach based on past sentencing data. Instead, the court in *Dorvee* found the guideline to be based on mandates from Congress requiring harsher and harsher penalties. *Id.* at 184-186. The court found the mandated guideline results in sentences that routinely come close to the maximum statutory penalty for run of the mill cases because specific offense enhancements penalize conduct that is inherent in the commission of the crime for virtually all offenders. *Id.* at 186-187. The court noted that the typical guideline calculation is much higher than guideline calculations for offenses involving the use of guns or violence. *Id.* at 187-188. The Court of Appeals has indicated it will "apply particular scrutiny to sentences based on Guidelines § 2G2.2." *United States v. Bourque*, 520 Fed.Appx. 23, 25 (2d Cir. 2013).

The Second Circuit was not alone in its concern about guideline §2G2.2. *See United States v. Grober*, 624 F.3d 592, 608 (3d Cir. 2010) (like crack guidelines, district courts may vary from § 2G2.2 based on policy disagreement with them, and not simply based on an individualized determination in a particular case); *United States v. Stone*, 575 F.3d 83, 90 (1st Cir. 2009) (same).

In fiscal year 2010, defendants like Mr. Fuller–convicted of child pornography possession–were sentenced to a Guidelines term in only 39.5 percent of cases and in 2011 the number of Guidelines sentences fell to 27.3 percent of cases, prompting the Sentencing Commission

6

to prepare a report to Congress because of a number of concerns they saw with the guidelines and sentencing for non-production offenses in general.  U.S. Sent'g Comm'n, *Report to the Congress: Federal Child Pornography Offenses* (Dec. 2012) ["Comm'n Report"], at ii-iii, 134-135.[1]  The Commission explained that it compiled the report in large part due to the increasing rate of below-guidelines sentences pursuant to its statutory duty to "consider whether the guidelines are in need of revision in light of feedback from judges as reflected in their sentencing decisions," *id.* at ii, and because "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability." *Id.* at ii, 323.  The Commission concluded that "[t]he current sentencing scheme in §2G2.2 places a disproportionate emphasis on outdated measures of culpability regarding offenders' collecting behavior and insufficient emphases on offenders' community involvement and sexual dangerousness." *Id.* at xviii; *see also id.* at 321.

The Commission explained that because the enhancements for computer use and type and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability." *Id.* at iii, xi; *id.* at 209, 323.  Coupled with the base offense levels, the cumulative enhancements "result[] in guideline ranges that are overly severe for some offenders in view of the nature of their collecting behavior." *Id.*

The Commission reported that "not all child pornography offenders are pedophiles or engage in other sex offending." *Id.* at 104.  Approximately one in three offenders sentenced under § 2G2.2 "have engaged in" what the Commission deems "sexually dangerous behavior," criminal or non-criminal, past or present, based on allegations in PSRs, prior arrests, and prior convictions. *Id.* at ix-x, 204-05.  However, "the current guideline measures for offender culpability (e.g., for distribution of child pornography, number of images possessed, possession of sado-masochistic images) are generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." *Id.* at 204.

Mr. Fuller's case is emblematic of problems with the Guideline.  Notwithstanding his placement in criminal history category I, his lowest recommended sentence is 6 ½ years based on the following technically correct guideline calculation:

| | |
|---|---|
| Base offense level: | 18 |
| SOC: possession of images of prepubescent minors: | +2 |
| SOC: portrayal of sadistic/masochistic conduct: | +2 |
| SOC: use of a computer: | +2 |
| SOC: more than 600 images: | +5 |
| Timely acceptance of responsibility: | -3 |
| | |
| Total offense level: | 28 |

As both the court in *Dorvee* and the Sentencing Commission noted, the enhancements

---

[1] *See* http://www.ussc.gov/news/congressional-testimony-and-reports/sex-offense-topics/report-congress-federal-child-pornography-offenses

applied in Mr. Fuller's case are applied in the mine run of cases.  In Fiscal Year (FY) 2010, about 95% of all individuals convicted of child pornography possession offenses received enhancements for possession of images of a prepubescent minor, for use of a computer, and for the number of images possessed.  A majority also received an enhancement for sadistic/masochistic images, and more than a quarter also received an enhancement for distribution.  Comm'n Report at 209.

The Commission identified three factors that should be considered measures of culpability and future dangerousness in any future Guideline:  evidence of other sexually dangerous behavior; contact with other child pornography offenders in on-line or other communities; and consideration of the defendant's collecting behavior, specifically considering current measures like the size and nature of a defendant's collection but also the degree to which an offender catalogued his collection by age, gender, or type of sexual activity depicted.

Using these criteria, Mr. Fuller's case would not be considered particularly aggravated.  First, aside from the false and completely unsupported allegations made by Ms. Zielstrof and his daughter, there is no evidence that Mr. Fuller has ever engaged in sexually dangerous behavior of any sort. He has never touched or child tried to touch a child. Second, no evidence exists that Mr. Fuller has ever been part of any "community" of offenders or has minimized the seriousness of child exploitation. One of the Commission's findings was that the internet has facilitated the growth of child pornography communities that normalize and validate the sexual exploitation of children, promote the market for child pornography, and may encourage the production of new images of child pornography, with some offenders being actively involved in those communities, and others not.  The Commission found that those who were involved in such communities were more culpable than those involved in impersonal receipt. Mr. Fuller does not excuse the possession of child pornography and never sought to join any "community" that aimed to validate it.

Finally, Mr. Fuller's "collecting" behavior–which under the current Guideline is the driving force at sentence but in the Commission's view should be but one factor–was practically nonexistent. While Mr. Fuller possessed a number of offending images, the Court should note that the vast majority of images recovered from his devices were of clothed children who were not depicted in sexual situations.  In fact the ratio of these types of images to illegal images found on Mr. Fuller's media is over 400 to 1.  It is obvious that Mr. Fuller's actual interest was in these entirely legal images rather than the pornographic images. In fact, though Mr. Fuller was aware that some illegal images were contained on his devices, he had tried to delete many of them because he was really only interested in erotica or glamour photos that comprised the vast majority of images recovered.  Also, Mr. Fuller did not engage in any "cataloging" or categorizing of illegal images.

Mr. Fuller's offense, while serious and deserving of punishment, is a typical child pornography possession offense. There is no evidence of distribution or sharing of images, or evidence of belonging to a community of offenders. In fact, because of Mr. Fuller's obvious interest in images that are not pornographic (of which he possessed over 500,000), his case is poses fewer concerns about recidivism than the typical case.

The defense provided the Probation Department and the government with thousands of pages of medical records. Based on the records provided, there is no question that Mr. Fuller suffers from a painful form of muscular dystrophy. The records also verify Mr. Fuller's other health

problems, including coronary artery disease and back problems related to his muscular dystrophy that have required spinal fusion surgery as well as the placement of rods near his spine.

The medical records provided go back to 2010 and are replete with mentions of his muscular dystrophy. The records indicate that the diagnosis of muscular dystrophy was often made from examinations and not based on self-reporting. For example, in 2010, Mr. Fuller required cardiac catheterization, and was placed under general anesthesia because his muscular dystrophy made it impossible for him to swallow the transesophageal echocardiography probe. On June 21, 2016, Dr. Ross from Kingsbrook Medical Center examined Mr. Fuller and found that he has internuclear ophthalmoplegia (problem revealed when a person tries to look to the side) consistent with muscular dystrophy. Dr. Ross also determined that Mr. Fuller, because of his muscular dystrophy "will ultimately require a nursing home."[2]

Mr. Fuller's medical problems affect the appropriate sentence in two ways. First, because the care he requires is idiosyncratic, the BOP is unlikely to be able to provide appropriate treatment. Mr. Fuller suffers from type 2 muscular dystrophy, which is rarer than type 1. Effective treatments have been determined for him only over years of trial and error. Whenever he is treated by new physicians, this history is generally ignored, which greatly frustrates Mr. Fuller. Because it is unlikely the BOP will be able to adequately treat his muscular dystrophy and other ailments, a guideline sentence would be unreasonable. In fact, it seems unlikely that Mr. Fuller would survive a 6 year sentence.[3]

Mr. Fuller's confinement to a wheelchair and otherwise weakened condition ensures that he will suffer incarceration more than the average inmate. He is often confined to his bed, feeling too weak to get into his wheelchair. He is almost completely dependent on others for daily tasks. His condition leaves him defenseless against other inmates and in constant fear (because of the nature of his offense, he has been threatened with physical violence more than once.) This situation will not be alleviated even if Mr. Fuller is moved to a prison hospital. Though his care may be better in such an institution, he will still be dependent on prison staff (or other inmates) for most of his daily activities and he will still be at risk from other inmates.

Mr. Fuller has now been in detention for more than a year. This period has been difficult for him because of his poor health and also because the nature of his crime makes him a target in prison. Because he is estranged from his only living family member in this country and essentially lived in transient hotels, it has not been possible for him to be released on bail. Any need for punishment in the form of a jail term in this case has surely been met by the time Mr. Fuller has already served. The other goals of sentencing would best be met by a period of supervision. Whatever sentence the Court imposes, Mr. Fuller will be required to register as a sex offender, a lifelong stigma.

---

[2] The defense belabors this point only because of the false allegations from Ms. Zielstrof and Mr. Fuller's daughter that he is a malingerer.

[3] On April 6, 2016, soon after his arrival at MDC, Mr. Fuller was taken to NYU Lutheran Medical Center. The doctor who examined him answered "no" to the following question on his medical record: "Would you be surprised if this patient died within the next 6 months."

9

A term of supervision in a case involving this type of offense is intensive and, in combination with the collateral consequences of a felony conviction, ensures that the sentence reflects the seriousness of the offense and provides just punishment for the offense.

In light of all the circumstances of this case, including Mr. Fuller's medical condition, the nature of the vast majority of images recovered from his devices, and the problems with the Guidelines in assessing culpability, we ask the Court to impose a sentence well below the guideline minimum – one that would allow Mr. Fuller to leave prison soon and begin to rebuild his life under the supervision of the Probation Department.  We believe that this will be a sentence sufficient, but not greater than necessary, to achieve the goals of sentencing.

Thank you for your consideration.

Respectfully yours,

/s/

Michael K. Schneider, Esq.
Attorney for Mr. Fuller
(718) 330-1161

cc:    AUSA Moira Kim Penza, Esq.
      USPO Victoria Main
      Clerk of Court (ECF)
      Mr. Robin Fuller