1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,      : 16-CR-00254(BMC)
                               :
                               :
                               :
        -against-              : United States Courthouse
                               : Brooklyn, New York
                               :
                               :
ROBIN ALAN FULLER,             : Monday, September 11, 2017
                               : 11:00 a.m.
            Defendant.         :
                               :
                               :
                               :

- - - - - - - - - - - - - X


TRANSCRIPT OF CRIMINAL CAUSE FOR FATICO HEARING
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

For the Government:  BRIDGET M. ROHDE, ESQ.
                        United States Attorney
                        Eastern District of New York
                        271 Cadman Plaza East
                        Brooklyn, New York 11201
                     BY:  MOIRA KIM PENZA, ESQ.
                        TYLER JOSEPH SMITH, ESQ.
                        Assistant United States Attorney


For the Defendant:    ROTHMAN, SCHNEIDER, SOLOWAY & STERN, P.C.
                        100 Lafayette Street
                        Suite 501
                        New York, New York 10013
                     BY: ROBERT SOLOWAY, ESQ.


Court Reporter:      VICTORIA A. TORRES BUTLER, CRR
                        225 Cadman Plaza East/Brooklyn, NY 11201
                        VButlerRPR@aol.com
Proceedings recorded by mechanical stenography, transcript
produced by Computer-Aided Transcription.


VB      OCR      CRR

```
                      Proceedings                        2

1           (In open court.)

2           (Judge BRIAN M. COGAN enters the courtroom.)

3           THE COURTROOM DEPUTY:  All rise.

4           THE COURT:  Good morning, have a seat, please.

5           (Defendant enters the courtroom.)

6           THE COURTROOM DEPUTY:  United States versus Fuller.

7           Counsel, please state your appearances for the

8    record, starting with the Government.

9           MS. PENZA:  Moira Kim Penza for the United States.

10   Good morning, Your Honor.

11          With me at Counsel table is Tyler Smith, Victoria

12   Main from United States Probation and Steven Mullen,

13   Department of Homeland Security Investigations.

14          THE COURT:  Good morning.

15          ALL:  Good morning.

16          MR. SOLOWAY:  Good morning, Your Honor.

17          Robert Soloway for Robin Fuller.  I apologize for

18   being ten minutes late.

19          THE COURT:  No problem, I was running a little late

20   myself, it worked out fine.

21          Good morning.

22          Good morning, Mr. Fuller.

23          THE DEFENDANT:  Good morning.

24          MR. SOLOWAY:  One thing.  My client has demanded

25   that before any, most respectfully, Judge, before any
```

Proceedings                                                        3

1   proceedings commence, that I move that the indictment be

2   dismissed in its entirety on the basis of the Government

3   knowingly preferring and endorsing false information

4   specifically relating to the e-mails which the Government has

5   lately turned over that resulted in the stop at JFK.

6            That's my understanding of his application, so I am

7   presenting it, Judge.

8            THE COURT:  Okay.

9            I do not even think I have the power to dismiss the

10  indictment when the defendant has already pled guilty.  I

11  think he would have to move to vacate his guilty plea and then

12  move to dismiss the indictment, although I suppose that could

13  be both done at the same time.  But even if I had the power, I

14  would deny the motion.

15           We have a number of factual issues to resolve in

16  connection with sentencing.  There is at least one that will

17  require the presentation of evidence and that is the issue of

18  whether the defendant had sex with his daughter and, if he

19  did, whether she was a minor at the time.  So, that is one

20  issue.

21           We then have the issue of whether the defendant has

22  been fabricating his health conditions.  I am not sure there

23  is going to be evidence beyond the documents I have received

24  from both sides on that.

25           Then we have a number of objections that predecessor

Proceedings                                    4

1  Counsel for Mr. Fuller raised to the PSR, which are also

2  factual in nature.

3          I think we should address the first issue first,

4  since that involves a civilian witness.  Let's get that one

5  done and out of the way and then we can talk about the order

6  of the proceeding as to the others.

7          Does that sound all right?

8          MS. PENZA:  Yes, Your Honor.

9          MR. SOLOWAY:  Yes, Your Honor.

10         THE COURT:  All right.

11         The Government may call its first witness.

12         MS. PENZA:  The Government calls Nanette Fuller.

13         (Witness enters and takes stand.)

14         THE COURTROOM DEPUTY:  Please, raise your right

15  hand.

16  **N A N E T T E   F U L L E R,**

17         called as a witness having been

18         first duly sworn, was examined and testified

19         as follows:

20         THE COURTROOM DEPUTY:  Please, state and spell your

21  name for the record.

22         THE DEFENDANT:  Nanette Fuller -- N-A-N-E-T-T-E,

23  F-U-L-L-E-R.

24         THE COURTROOM DEPUTY:  You may be seated.

25         THE WITNESS:  Okay.

1           THE COURT:  All right, you may inquire.

2    DIRECT EXAMINATION

3    BY MS. PENZA:

4    Q     Good morning, Ms. Fuller.

5           How old are you?

6    A     Thirty-seven.

7    Q     What is your date of birth?

8    A     6/30/1980.

9    Q     Do you currently work?

10   A     Yes.

11   Q     What do you do?

12   A     I'm transportation coordinator warehouse, schedule

13   outbound truck loads.

14   Q     How long have you been doing that type of work?

15   A     About 13 years.

16   Q     And have you been working your entire adult life?

17   A     Yes.

18   Q     What level of education have you achieved?

19   A     I have a bachelors degree, but I've been working on my

20   masters.

21   Q     What did you receive your bachelors degree in?

22   A     Operations and supply chain management.

23   Q     Where did you receive that?

24   A     Franklin University.

25   Q     When did you receive that?

N. Fuller - direct - Penza                    6

1              MR. SOLOWAY:  I'm sorry, I didn't catch that.

2              THE COURT:  Can you repeat your answer.

3              THE WITNESS:  Franklin University.

4              MR. SOLOWAY:  Thank you.

5    Q    When did you receive that?

6    A    2013.

7    Q    Do you have any children?

8    A    Two.

9    Q    How old are they?

10   A    Ten and sixteen.

11   Q    What are your parents' names?

12   A    Robin Fuller and Esther Fuller.

13   Q    Do you see your father in the courtroom today?

14   A    Yes.

15   Q    Can you please identify an article of clothing he's

16   wearing?

17   A    It's like a green jump shirt, jumpsuit.

18              MS. PENZA:  Your Honor, may the record reflect that

19   Ms. Fuller has identified the defendant as her father.

20              THE COURT:  It does.

21   Q    How long did you last see your father?

22   A    About 18 years.

23   Q    Do you have any siblings?

24   A    A brother.

25   Q    How would is your brother?

1    A    Thirty-five.

2    Q    When you were growing up, did your parents work?

3    A    I remember my mom working off and on, but I don't

4    remember my dad working.

5    Q    What did your mom do for employment?

6    A    Like home health care, nursing aide.

7    Q    You said you don't remember your father working.

8         What did he do for money?

9    A    Social Security Disability.

10   Q    And what was his disability?

11   A    Muscular dystrophy.

12   Q    Do you remember ever going to doctors with your father?

13   A    No.

14   Q    Would you ever go to waiting rooms?

15   A    Yeah, I would sit in like, a waiting room or hospital ER

16   room.

17   Q    Did your father ever tell you about any visits with

18   doctors regarding his Social Security Disability?

19   A    Not when I was little, but when I was a teenager.

20   Q    Okay.  What would he tell you when you were a teenager?

21   A    That he had to get a form filled out each year to say

22   that he was still disabled to keep getting his disability.

23   Q    And would doctors fill out those forms?

24   A    Yes, for most of the part.

25   Q    Did he ever have any trouble getting those forms filled

N. Fuller - direct - Penza                    8

1  out?

2  A    There was one time when we were in Boise, Idaho.

3  Q    And we'll talk about that later.

4       Did you move around a lot as a child?

5  A    Yes.

6  Q    Why was that?

7  A    From my understanding, it was either we were getting

8  evicted or he was --  later I would hear that he was

9  classified military.

10  Q    Starting from when you were born until approximately age

11  twelve, where did you live?

12  A    Between Arizona, Idaho and California.

13  Q    And with whom did you live?

14  A    Always with my dad.

15  Q    Okay.  Did you also live with your mother sometimes?

16  A    She would come and go.

17  Q    Were your parents married?

18  A    Until I was about twelve.

19  Q    Can you describe your day-to-day life as a child?

20  A    I basically go to school and go home.  I learned to be

21  seen and not heard; like, I never had friends.  It was just, I

22  just kept to myself.

23  Q    Why was that?

24  A    My dad didn't trust people.

25  Q    Okay.  Did he tell you why he didn't trust people?

  
1    A    No.

2    Q    Were you allowed, as a child, to participate in any

3    activity outside of the house?

4    A    Not when I was young.

5    Q    Were you allowed to have any friends?

6    A    Not that I remember.

7    Q    Did any friends ever come over to your house?

8    A    No.

9    Q    What types of rules were in place in your house as a

10   child?

11   A    Beyond that, I just remember my dad always like, eating

12   first.  My mom would have to serve him his food and then, what

13   was left, she would give to my brother and I.

14   Q    And what would she eat?

15   A    If there was any left, she would eat some, but sometimes

16   she would just go hungry.

17   Q    Can you describe the relationship between your parents?

18   A    It was really rocky.  They would scream and yell a lot.

19   Q    Did you ever witness any physical abuse?

20   A    I never witnessed it, but I would see the marks.

21   Q    Okay.  Are there any incidents you remember from your

22   childhood, your parents fighting in particular?

23   A    The one that I remember the most was my mom was having

24   like, female issues and he wouldn't let her, he wouldn't take

25   her to the hospital and she ended up having to like, crawl out

1   of the house because she was in so much pain and a friend of

2   hers took her to the hospital.

3   Q     What happened once she when the to the hospital?

4   A     She ended up having surgery.

5   Q     Did you ever witness any violence from your father

6   towards anyone else in the household?

7   A     My brother.

8   Q     Okay.  Can you tell me about that?

9   A     Probably about once a month my dad, he always wore a

10  leather belt and if he didn't like something my brother said

11  or did, he would take his belt off and make my brother pull

12  his pants down and underwear down to his ankles, and he would

13  take the belt to his butt.

14  Q     And what side of the belt would he use?

15  A     Most of the time it had the buckle part.

16  Q     Okay.  And how many times?

17        MR. SOLOWAY:  Your Honor, excuse me.  I apologize.

18  I think Mr. Fuller wants to address the Court about his

19  inability to remain in the courtroom listening to all of this

20  perjury and he is demanding that I alert you to that fact,

21  Judge; notwithstanding that he has a right to be here and

22  listen.

23        THE COURT:  Well, I think he has a right to absent

24  himself if he wants to.

25        THE DEFENDANT:  I'm told I can't respond or anything

1    or have a right to anything.  I've been told to shut up.

2          THE COURT:  You do not have the right to speak,

3    Mr. Fuller, that is true.  If you would care to take the stand

4    later, your attorney can put questions to you and you can

5    answer questions, but you cannot interrupt a witness's

6    testimony.

7          So, it is really up to you.  You are strongly

8    discouraged from leaving.  It is your Constitutional right to

9    be here and hear the testimony, but if you are going to

10   absolutely insist on leaving, I will not require you to stay.

11         Let's continue.

12   By MS. PENZA:  (Continuing)

13   Q    Ms. Fuller, how many times would your father hit your

14   brother when he would hit him?

15   A    Two or three times, up to ten or more, depending on how

16   angry he was.

17   Q    Okay.  And from what time period is this, from what ages?

18   A    My brother would have been about ten.  So, between ten

19   and fourteen.

20   Q    And what would your father say to your brother before he

21   would hit him?

22   A    I don't really remember what he said.  I just remember

23   hearing a lot of yelling.

24   Q    Okay.  And you said -- did he tell him to take his

25   underwear down as well?

1  A     Yes, yes.

2  Q     Other than on the buttocks, did your father ever hit your

3  brother anywhere else?

4  A     There was one time where my brother was resisting and he

5  stuck his foot up, and his -- my dad's wrist, hit his foot and

6  made him angry, so he just started hitting harder and it got

7  him across his back.

8  Q     How many times during that incident, how many times did

9  your father hit your brother?

10  A     It was quite a few.  I, I, I'd say at least ten.

11  Q     Okay.  And that again, was that with the buckle side?

12  A     It was a combination.

13  Q     Okay.  And was there something, did your brother have an

14  injury to his back prior to that incident?

15  A     Yeah.  When my brother was born, he had an extra bone

16  connecting his shoulder blade to his backbone in some way, and

17  went to Shriners Hospital and had surgery when he was about

18  six or so.  He was really little.  And it made his, part of

19  his back really weak, so he was told that he couldn't take

20  sharp hits to his back.

21  Q     Were there any marks left on your brother's body after

22  your father would hit him?

23  A     The only time I saw him was when he hit him on his back

24  and he had some welts on his back.

25  Q     Did your father ever hit you?

1    A    One time when I was really little.

2    Q    Okay.  What do you remember from that incident?

3    A    I just remember I had to do the same thing, pull my pants

4    down and underwear down, and lean over a bed, and he hit me

5    just a couple times.

6    Q    Okay.  After that, did he ever hit you again?

7    A    No.

8    Q    Why not?

9    A    Because I learned to be quiet and not say anything and

10   not fight back.

11   Q    What would you do when your brother was being hit?

12   A    I would hide in my room.

13   Q    What did your mother do while your brother was being hit?

14   A    She wasn't around.

15   Q    And why do you think your brother was hit so often

16   compared to you?

17   A    Because my brother was vocal.

18   Q    Did your father, was your father ever verbally abusive to

19   anyone in the family?

20   A    My mom.  I mean, he was always yelling at someone, so.

21   Q    Okay.  After you turned twelve, where did you move?

22   A    Arizona.  Casa Grande Eloy.

23   Q    And why did you move there?

24   A    I don't know why.

25   Q    Okay.  Did you stay in Arizona until you graduated high

1    school?

2    A     Yes.

3    Q     When you moved to Arizona, where did they place you in

4    school?

5    A    I started off in eighth grade, but I was only there for a

6    couple months.  They were still far behind my level of

7    education that they placed me up into 9th grade.

8    Q     Okay.  So, for the remainder of your time in Arizona,

9    were you always one grade level ahead of your age?

10            MR. SOLOWAY:  Objection, leading.

11            THE COURT:  Sustained.

12   Q     For the rest of high school, what grade did you stay in

13   compared to your age?

14   A    I was always a year ahead.

15   Q     Did you participate in -- when you were in Arizona, who

16   did you live with?

17   A    My dad, most of the time, but I would spend a few weeks

18   or a few months at a time with my grandparents.

19   Q     Whose parents were they?

20   A     My dad's parents.

21   Q     Can you describe for me your relationship with your

22   paternal grandparents?

23   A    My grandfather and I were really close.  My grandfather

24   was like, they would always follow us around every time we

25   moved and I always felt like my grandfather protected me.  My

1  grandfather, I don't remember, he never really got along with

2  my dad.

3  Q    How about your grandmother?

4  A    But my grandmother supported my dad.

5  Q    Were you allowed to participate in any activities in

6  middle or high school?

7  A    In middle school I started to run track one time, but I

8  hurt my ankle and, and once I did that, I wasn't allowed to go

9  do track again.

10       And then I did marching band but only because my

11 grandfather paid for my instrument and got me started.

12 Q    What was your father's reaction to you participating in

13 the band?

14 A    He didn't like it.  He wouldn't participate or help at

15 all.  I had to get rides.

16 Q    Going back to track.

17       Can you tell me what happened when you got injured?

18 A    Oh.  I went to the hospital and I had like, a hairline

19 fracture on my ankle.  And they wanted to finish breaking it

20 so they could set it correctly and he wouldn't let them do it,

21 said they were just out to get more money, made them do just

22 the minimum and then took me home.

23 Q    And how is your ankle now?

24 A    It's still weak.  Like, it twists real easy.

25 Q    When you were a child, did you receive regular medical

1    care?

2    A    Not that I remember.

3    Q    Do you remember any experiences of going to the doctor?

4    A    No.

5    Q    Did there come a time when you moved in with your

6    grandmother?

7    A    Yeah, when my grandfather died.

8    Q    Okay.  How old were you then?

9    A    Fourteen.

10   Q    And who lived in the house then?

11   A    My dad and my brother, my grandmother and myself.

12   Q    How long did your brother end up staying in the house?

13   A    About, about a year-and-a-half.

14   Q    Okay.  And why did he ultimately leave?

15   A    There was one date that my dad was yelling at me and

16   since I don't speak back to him, I was standing there.  My

17   brother decided to speak up for me and my dad hit my brother.

18   My brother stood up and started to fight back and my dad

19   kicked him.  He went a couple feet in the air and landed on

20   his hands and knees, and got up, and ran out the sliding door

21   and never came back.

22   Q    Okay.  I'd like to turn attention to your senior year of

23   high school.

24            How old were you that year?

25   A    Sixteen.

1   Q    When would you have turned 17?

2   A    June 30th, '97.

3   Q    What happened in the spring of your senior year of high

4   school?

5   A    My grandmother died.

6   Q    Okay.  And when was that, do you remember?

7   A    April '97.

8   Q    What happened after your grandmother died?

9   A    I remember my dad taking off for a while and then, he

10  came back with a girlfriend of his that he said he met in

11  Indiana while doing helicopter training for the military.

12  They came back and it was right around my graduation time.

13  Q    Okay.  What was your dad's girlfriend's name?

14  A    I remember it as Gerri.

15  Q    Okay.  What happened at graduation?

16  A    I remember my dad wasn't going to come and him and Gerri

17  fighting.  Gerri ended up making him come.

18  Q    Go ahead.  Sorry.

19  A    We got to graduation and it was a really, really small

20  graduation class, like maybe 60 kids.  And, of course, my name

21  Fuller, towards the front of it, but I remember before I even

22  crossed the podium, my dad had walked out.

23  Q    You may have said this already, but when was your

24  graduation?

25  A    May of '97.

1    Q    After your graduation, how long did you stay in Arizona?

2    A    Just a couple months, two or three months, because we had

3    to sell that house.

4    Q    Okay.  Why did you have to sell the house?

5    A    It was in probate between my dad and uncle.

6    Q    And did the house sell?

7    A    Yes.

8    Q    What happened after the house sold?

9    A    We stayed in a hotel until we figured out where he wanted

10   to go.

11   Q    Who stayed in the hotel?

12   A    Just my dad and myself.

13   Q    Can you describe the hotel for me?

14   A    It was one bed, little, cheap.  Like a little, really

15   cheap run-down-style hotel.

16   Q    How long did you stay there?

17   A    About a week that I remember.

18   Q    When you arrived at the hotel, what was your

19   understanding of how, what the sleeping arrangements were

20   going to be?

21   A    That we'd have to share the bed.

22   Q    Prior to that week, had you ever shared a bed with your

23   father?

24   A    No.

25   Q    What happened at the hotel?

1    A    My, my dad would turn on like, pornography videos in the

2    evenings.  And then it was one time where he actually, he said

3    that it was, I was getting older and it was his duty as a dad

4    to teach me.

5    Q    Prior to going to that hotel, had you ever seen

6    pornography before?

7    A    No.

8    Q    What else do you remember your father saying to you?

9    A    That he wanted to, he said he wanted to teach me how, how

10   men and how male parts work.

11   Q    So, what happened next?

12   A    He got, well.  I was facing the other way because I

13   didn't want to look at anything, but he got undressed from his

14   waist down.

15   Q    Were you on the bed at that point?

16   A    Yes.

17   Q    Okay.  Had you ever seen your father naked before?

18   A    No.

19   Q    Okay.  What happened next?

20   A    Well, he came back to bed and he had like, this shoe

21   string kind of thing, reminded me of a shoe string.  And he

22   started touching his penis and got just a little hard and then

23   tied the string on him, and then continued touching himself

24   until he was able to ejaculate.

25   Q    Okay.  When he initially was putting the string on his

1   penis, did he say anything?

2   A    Not that I remember.

3   Q    How about at the very start?

4   A    He was just, just, that this is how, how, he wanted to

5   show me how things work.

6   Q    Did he say -- where were you facing while this was

7   happening?

8   A    I was laying on my back kind of looking at him off and

9   on.

10  Q    Did he say anything to you about where you should look?

11  A    He wanted me to be looking at him.

12  Q    What happened once he ejaculated?

13  A    He got up and cleaned himself off and came back to bed,

14  but laid down in a different spot on the bed.

15  Q    How many times did this happen while you were in Arizona?

16  A    Just the once that I remember.

17       MR. SOLOWAY:  I'm sorry, I didn't hear that.

18       THE WITNESS:  Just once that I remember.

19  Q    What about the pornography?  Did this happen on any other

20  nights?

21  A    It was a least a couple other nights, but I can't tell

22  you how many.

23  Q    What did you say to your father when this happened?

24  A    Nothing.

25  Q    Why didn't you say anything?

1   A     Because I was afraid to.

2   Q     What were you afraid of?

3   A     All this time I learned to just be quiet, to keep from

4   getting the abuse that everybody else I saw get.

5   Q     Okay.  What happened after the hotel in Arizona?

6   A     We were started to head up to Boise, Idaho.  We stopped

7   in a hotel outside of Nellis Air Force base in Vegas.  We got

8   there kind of late, but then I remember him saying he had to

9   go out for some work and he was in his uniform that he had

10  made and I stayed behind in the hotel.  Woke up the next

11  morning to him telling us that we had to leave because he

12  forgot his ID and that we needed to leave as quick as

13  possible.

14  Q     You said he had made a uniform.

15        Can you tell me more about that?

16  A     Like, we would go into, I guess it's like military supply

17  stores or surplus stores, just wherever he could go and buy

18  patches and stuff.  And he had like, designed like a general's

19  outfit.

20  Q     Do you remember when he did that?

21  A     It was off and on for years.

22  Q     Do you know how many uniforms he had?

23  A     Just the one that I know of.

24  Q     Did he stay overnight with you in the hotel that night?

25  A     No, he was not there.

1   Q     Where did you go next?

2   A     We went up to Boise, I don't remember if it was Boise or

3   Napa.  It's the same general area.  And his girlfriend Gerri

4   met us up there and we went into an apartment.

5   Q     Okay.  Can you describe that apartment, please?

6   A     It was a, just a small, two-bedroom apartment.

7   Q     And do you know approximately when this was?

8   A     At late, late '97.

9   Q     Okay.  What do you remember from being in Idaho?

10  A     I remember going to a Catholic mass for Christmas Eve

11  because Gerri was very Catholic.  So, that's why I can

12  remember that date because I can remember being there for

13  Christmas.

14  Q     Had you ever been to mass before?

15  A     No.

16  Q     What was life -- what was the relationship between Gerri

17  and your father like?

18  A     It seemed pretty calm.  I don't remember there being a

19  lot of issues going on until after the military police,

20  whoever they were, they came in and took my dad's uniforms and

21  what I always considered to be fake IDs.  And then after that,

22  Gerri said that she couldn't take it anymore and she was going

23  to leave.

24  Q     Okay.  So, let's just back up a little bit.

25        Was this raid on the house after Christmas?

1   A    That I can remember it being after Christmas.

2   Q    Okay.  And what exactly happened?

3   A    I just remember sitting in the living room and them

4   coming and knocking on the door and saying something about he

5   tried to get on a military base again.

6   Q    And what did your father do when they were in the house?

7   A    He was just really angry and irate, screaming and yelling

8   at them.

9   Q    Do you remember some of the things he said?

10  A    No.

11  Q    After that, is that when Gerri left?

12  A    Yeah.

13  Q    How long and how long after that did you -- how long did

14  you stay in Idaho?

15  A    Not very long because I can remember driving in a U-Haul

16  down through the mountains of Nevada as we headed towards

17  California and there was still snow on the roads.

18  Q    Why did you leave Idaho?

19  A    That was when I learned that the doctors wouldn't sign

20  the doctors' notes, saying that he was just out for drugs and

21  he wasn't really that disabled.

22  Q    Okay.  Tell me --

23          MR. SOLOWAY:  Objection to "I learned," Judge.

24          THE COURT:  Well, it is a Fatico hearing.  You can

25  cross-examine on that.

1   Q    How did you learn what had happened at the doctor?

2   A    He told me.

3   Q    So, what exactly did your father tell you, to the best of

4   your recollection?

5   A    Just that he hated the doctors, that nobody understood

6   what he was dealing with and we didn't know what we were going

7   to do.

8   Q    Okay.  And did the, what you just said about, did he say

9   anything about what the doctors -- did he tell you anything

10  about what the doctors said regarding filling out the form?

11  A    Just that he wouldn't fill it out.  He didn't think he

12  was that disabled, that he could still work.

13  Q    And what was your father's demeanor when he was telling

14  you that am?

15  A    He was really upset.

16  Q    Okay.  How long after that did you leave Idaho?

17  A    It was pretty quick, I can't tell you the exact date, but

18  it was pretty quick.

19  Q    And where did you go?

20  A    California, San Diego, Escondido.

21  Q    Why did you go there?

22  A    Because he had a friend named Doug down in San Diego.

23  Q    Okay.  What happened once you got to San Diego?

24  A    Well, we weren't able to get an apartment at first, so we

25  ended up staying in a hotel again.

1   Q    Why couldn't you get an apartment?

2   A    I was just a teenager, I don't -- but from my

3   understanding, it was because of his credit.

4   Q    Okay.  Had there been problems with checks with your

5   father?

6   A    Yeah.  It was again my understanding, because he was

7   always spending money but yet we could never pay the bills.

8   It seemed like part of the reason we were always skipping

9   around was he was writing bad checks.

10  Q    Did he ever tell you anything about those checks?

11  A    Not directly.

12  Q    You said you went to a hotel?

13  A    Yes.

14  Q    Okay.  Can you describe that hotel for me?

15  A    Okay, it was like the first one, one bedroom, cheap,

16  little hotel.

17  Q    How long did you stay in that hotel?

18  A    From what I can remember, about a month.

19  Q    And how old were you then?

20  A    Seventeen.

21  Q    How do you know?

22  A    Because I said we drove down through the mountains and

23  there was still snow on the roads, so that would have to have

24  been March or April at the latest.

25  Q    And when would you have turned 18?

1   A   Not until the end of June.

2   Q   Tell me what happened at the hotel.

3   A   Well, he would watch more of the pornography videos.  It

4   wasn't daily, but he would have, watch them quite often and

5   then there was another time much like the time in Arizona.

6   Q   Okay.  Tell me happened.

7   A   He got himself undressed he, to put, took the blankets

8   off the bed this time and got himself undressed from his waist

9   down.

10  Q   Was this one bed again, in this hotel?

11  A   Yes.

12  Q   Okay, I'm sorry.

13  A   And again, had that string and told me that I needed to

14  pay more attention this time, but it, it, it was pretty much

15  the same thing like the first time.  He did everything

16  himself, only he got up and went to the bathroom before he

17  actually ejaculated.

18  Q   Did you watch him the whole time that time?

19  A   Most of the time, but I tried to close my eyes.

20  Q   Okay.  What did he say while it was happening?

21  A   He was getting angrier, like I needed to be paying

22  attention.

23  Q   Anything else that you remember him saying?

24  A   Just that he was still trying to teach me.

25  Q   Was there another incident?

1   A     There was a couple more.

2   Q     Okay.  What about the next time?

3   A     The next time it started off the same way only he made me

4   sit cross-legged at his waist.

5   Q     What were you wearing?

6   A     I had my pajamas on, my pants and shirt-style pajamas.

7   Q     Did he ask you to get undressed?

8   A     He wanted me to, but I wouldn't.

9   Q     Did you say no?

10          MR. SOLOWAY:  I didn't hear the question.  Or the

11  answer.

12          THE COURT:  She said:  Did he ask you to get

13  undressed?

14          And she said:  He wanted me to, but I said no.

15          MR. SOLOWAY:  Okay.

16  Q     Did you use the words no?

17  A     No, I didn't say anything.  I just wouldn't do it.

18  Q     And where is your father on the bed?

19  A     He's laying down with his head on the pillow.

20  Q     And he is undressed from the waist down?

21  A     Yes.

22  Q     And what happened then?

23  A     He took my hand and helped me hold the shoe string to

24  wrap it around his penis.

25  Q     Did he say anything to you before doing that?

1    A    Not really.

2    Q    How much contact did you actually have with his penis

3    when you were touching him?

4    A    Not a whole lot, just whatever it took to put the string

5    around.

6    Q    Did you touch it when you were putting the string on?

7    A    Just, just like in passing.

8    Q    What did you do?

9         How does he actually wanted string tied on to his

10   penis?

11   A    It's like, looped around towards the top with two loose

12   ends so that you could pull each end to make it tighter or

13   looser.

14   Q    And would he want it moved tighter or looser while he was

15   masturbating?

16   A    He would play with it sometimes.

17   Q    Did he ask you to play with it?

18   A    That, that time, yes.

19   Q    Okay.  And then what happened?

20   A    He wanted me to use my hand to touch, to touch his penis

21   but I actually pulled away.

22   Q    Did he say anything when you pulled away?

23   A    I don't remember if he said anything.  I know he wasn't

24   happy.

25   Q    What did you do to show that he wasn't happy?

1   A    He just, like, would just like, sigh and just get that

2   face that I knew that he'd make when he was angry.

3   Q    Did he ejaculate in front of you that time?

4   A    No.

5   Q    Okay.  What did he do?

6   A    He went to the restroom.

7   Q    And what did he do when he came out?

8   A    He just crawled back in bed and laid down and faced the

9   other way.

10

11              (Continued on following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    EXAMINATION CONTINUES

2    BY MS. PENZA:

3    Q    Did you say anything to your father about what had

4    happened?

5    A    No.

6    Q    Why not?

7    A    Again, I was scared to.

8    Q    Were there any additional incidents?

9    A    Yeah, one more that I remember.

10   Q    Okay.  What happened that next time?

11   A    Everything started off all the same, the only difference

12   was I -- I didn't pull my hand away the second time when he

13   had me start to touch it, his penis.

14   Q    Okay, so walk us through what happened.

15   A    Um, he had like the videos playing in the background just

16   with very little sound.  He took the covers off the bed and

17   was, again, naked from his waist down.  I was sitting at his

18   waist.

19   Q    How did you -- in both incidents how do you come to be

20   sitting at his waist?

21   A    He told me to sit like that, then I just -- so I just sat

22   like that.

23   Q    Sorry.  Please continue.

24   A    So then he helped me put the string on again and then

25   instead of letting go of my hand and me pulling away, I ended

1    up having to rub and stroke his penis until he got hard.  And

2    then he -- actually ejaculated in my hand that time.

3    Q    What happened -- what did you do when that happened?

4    A    I got up and went to the bathroom and washed my hand and

5    I remember feeling sick.

6    Q    Did your father say anything?

7    A    No.  When I came back out of the bathroom he had the

8    covers on the bed and was facing away.

9    Q    On other than those three incidents, do you remember any

10   other incidents while you were there?

11   A    No.

12   Q    How often do you remember the pornography playing?

13   A    I mean it wasn't nightly, but it was a few other times.

14   Q    Why didn't you pull your hand away the third time the way

15   you had previously?

16   A    He -- I guess I just -- like the fear that, I mean I saw

17   how angry he got the time before and like each time this

18   happened that he just got angrier, so I was just afraid.

19   Q    What were you afraid would happen?

20   A    Mostly of the yelling because he hardly ever really hit

21   me, but it was 'cause I was always quiet.  So I figured if I

22   did something he didn't want me to do, that since there was

23   nobody else around for him to hit, that I would be it.

24   Q    How long did you stay in that hotel with your father?

25   A    About a month, from what I remember.

1  Q    What happened after that?

2  A    Well, we ended up getting an apartment somehow.  It was a

3  two-bedroom apartment, and we spent a lot of time with his

4  friend out at parties and doing astronomy stuff.

5  Q    What was life like then once you moved out?

6  A    It -- things changed.  I remember he started buying

7  things again, like I got a really nice camera because I love

8  to take photos.  I had a Sea World membership and we spent a

9  lot of days at Sea World and like along the coast just taking

10  pictures.

11  Q    Were you allowed to go out by yourself?

12  A    No.

13  Q    So when you were at Sea World all those times, was your

14  father with you?

15  A    Yes.

16  Q    How long did you stay in San Diego?

17  A    Until May of '99.

18  Q    Okay.  Why, what happened in May '99?

19  A    A few months earlier my mom's dad had got in contact with

20  my dad's friend Doug to let me know that my mom had been given

21  six months to live and that he really wanted me to be able to

22  see my mom one last time, but before I could go my mom had

23  another surgery and it got put off.  But then when she got

24  better, my grandfather went ahead and paid for a roundtrip

25  plane ticket for me to go up and see my mom.  And I just -- I

N. Fuller - direct - Penza                    33

1    remember being surprised that my dad would even let me go.

2    Q    And did you go?

3    A    Yeah.  I don't remember who took me to the airport, but I

4    went.

5    Q    What happened when you got there?

6    A    My mom, she was really handicapped after her last

7    surgery, had a caregiver that stayed with her 24/7 and it's --

8    where she lived it was a tiny tourist town with a lot of

9    activities going on, so there was a lot to see and do.  And we

10   lived like maybe a five-minute walk to the beach, and I just

11   remember thinking to myself that that was the most fun I'd had

12   in my life.  And my mom thought it was really weird that when

13   I wanted to go to the beach that I asked if I could go to the

14   beach.  She thought it was weird that even though I was almost

15   19, that I was still asking to do such a simple task.

16   Q    Did you end up heading back to San Diego?

17   A    No.  A couple days before I was going to leave, my mom's

18   caregiver looked at me and said that:  You know you're 18, you

19   don't have to go back; a thought that had never occurred to

20   me.  And -- and I was really scared 'cause I knew he would

21   hate me and be angry, but at the same time I was away.  So

22   something just made me call and tell him that I wasn't coming

23   back, and I never did.

24   Q    And how did your father respond when you made that phone

25   call?

1    A    He was really angry.  That was the first time that he

2    started calling me names.  He called me an ungrateful bitch

3    and said some other things that I don't remember.  I just

4    remember being called the name.

5    Q    And then did you stay in Washington?

6    A    Yes.

7    Q    When you were in Washington, did you tell your mother

8    what your father had done to you in the hotels?

9    A    After -- after I decided to stay, my mom and her

10   caregiver, because she was always there, I kinda told them

11   just like really high level what had happened.  Like I hadn't

12   given them all the details that I gave today, just -- just

13   that he had the videos and was doing weird things.  And my mom

14   had an attorney that she had used when my brother got sent to

15   live with her and she had me talk to him.

16   Q    Can you tell me about that conversation?

17   A    I told the attorney basically the same thing.  And that

18   attorney told me that because I was 19 now and that it

19   happened in California, that I would have to go back to

20   California to file a complaint.  And that it would probably be

21   more he said/she said and just more stress on me, but that I

22   had that option to do so if I wanted to.

23   Q    So what did you decide to do?

24   A    I just let it go.  I never did anything.

25   Q    Why not?

N. Fuller - direct - Penza                35

1   A    Because I was away and I just wanted to move on.  I

2   didn't want to have to talk about it and I didn't want to have

3   to face him.

4   Q    When did you next see your father?

5   A    Today or, sorry --

6   Q    I'm sorry.  Going back once you moved to Washington, when

7   did you next see him?

8   A    He followed us up -- he followed me up there, just

9   probably a few months later he followed me up there.

10  Q    And where did he move?

11  A    Into an apartment down -- just a couple doors down from

12  us.

13  Q    Would you speak to him?

14  A    No.

15  Q    What would he do, what were your interactions?

16  A    He would, like, watch when we would come and go and he

17  would try to talk to us.  He kept trying to give me things

18  back because, obviously, when I left, I left with what I could

19  take on the airport -- in -- on a suitcase.  And he kept

20  trying to use that as a reason to talk to me, and I just would

21  walk away.

22  Q    Did you and your mother have any interactions with your

23  father?

24  A    He had bought a truck in my mom's name somehow or using

25  my mom's information.

1   Q     How did you find that out?

2   A     Because part of the issues my mom had was she couldn't

3   read real well.  She had really bad vision and I was her

4   caregiver, so I would open her mail and read for her.  And it

5   was a note saying that they were trying to -- trying to locate

6   the truck to pick it up.  And my mom called and told them

7   where the truck was because we knew it was just parked a

8   couple doors down.

9   Q     Had your mother purchased the truck?

10  A     No.

11  Q     And where was it parked?

12  A     It was in front of his house, my dad's house.

13  Q     Did there come a time when you became pregnant?

14  A     Yes.

15  Q     When was that?

16  A     In about July 2000.

17  Q     And how much older than you was the father?

18  A     About 15 years.

19  Q     And did your father find out that you were pregnant?

20  A     Yeah.  I had originally moved out of my mom's house

21  because, even though I was much older, it was still like I was

22  being a rebel teenager and I wouldn't listen to my mom and I

23  moved in with that guy.  But when I got pregnant, I waited as

24  long as I could.  So I was three months pregnant and I finally

25  told them that I wouldn't get an abortion.

N. Fuller - direct - Penza                     37

1   Q     Who are you telling that to?

2   A     My daughter's dad.

3   Q     Okay.

4   A     And so he walked out, just instantly.  And I remember

5   calling my mom up and I moved right back in with my mom, which

6   was right back to that apartment that was two doors down.

7   Q     So did your father see you after that?

8   A     Yeah.  When I started to show, my dad, one of his

9   comments to me was that he was gonna make sure that my bastard

10  child didn't grow up to carry on the Fuller name.

11  Q     Did he say anything else to you?

12  A     He called me like a slut and a whore and --

13  Q     After your father did that, what did you do?

14  A     We -- we tried to get a Restraining Order.  I don't -- I

15  honestly can't remember if it went through or not or if it was

16  even a temporary one, but I remember being told that they

17  couldn't locate him to serve him.

18  Q     And did you stay in the same apartment where you were

19  living?

20  A     My mom and I ended up moving.

21  Q     And where did you move?

22  A     Longview, Kelso, Washington.

23  Q     After that, after being in Washington and after he said

24  those things to you, when did you next see your father?

25  A     Here, today.

SAM     OCR     RMR     CRR     RPR

1   Q    Ms. Fuller, can you tell me how you learned about this

2   case?

3   A    It was the end of March, first of April.  My mom called

4   me and said that she had got a letter in the mail that just

5   seemed really odd and she actually didn't pay any attention to

6   it.  She thought it was a joke, like another one of my dad's

7   crazy attempts to try to get ahold of us.  But she eventually,

8   I believe, got a phone call from the probation officer,

9   Victoria.

10  Q    Okay.  And so then what did you do?

11  A    I guess my mom must have told them to talk to me, and I

12  remember getting a phone call from Victoria.  And even I

13  thought it was all fake and weird because I spent a couple

14  days actually researching and looking her up because I don't

15  trust people.

16  Q    What did you find when you looked her up?

17  A    I found her LinkedIn account and like all the titles and

18  everything matched, and I just remember it was really weird.

19  So I -- it seemed off the wall even for that, so I went ahead

20  and called her.

21  Q    And how long did you speak to her?

22  A    It felt like a couple hours.

23  Q    Have you spoken to other people since then?

24  A    Yes.

25  Q    And told them what happened to you?

1   A     Yes.

2   Q     Has your memory changed at all since your first

3   conversation with Victoria?

4   A     Yes.

5   Q     And how has that happened?

6   A     It's just I remember more because I had it all blocked

7   out for the longest time.  Though each time I talk about it,

8   like I just remember more or things are clearer.

9   Q     You mentioned your father trying to contact you.  From

10  the last time you saw him in Washington, prior to Ms. Main

11  contacting your family, what type of attempts did he make to

12  contact you?

13  A     Like Facebook.  He would have these weird accounts that

14  he would reach out to me on.

15  Q     What type of weird accounts?

16  A     They were always like female accounts, like female names.

17  Like one was trying -- they were like, like I had twin sisters

18  somewhere that I didn't know about.  I don't remember what

19  they said, I just remember he was -- it was -- he would send

20  strange messages and I would get creeped out and I would

21  delete my Facebook account.  Like, I was always recreating

22  accounts.

23  Q     When you'd receive these contacts from these women who

24  were people from accounts that were labeled as coming from

25  women, did it say what country those women were located in?

1  A     Most of them, no.  But there was one, the very last one.

2  It was like November of '14, 'cause it was right after I got

3  divorced.  And there was this one, I can't even begin to say

4  the name, it was a crazy name.  It said it was coming from the

5  Ukraine.  And the very first line was -- said, I see you went

6  back to your maiden name, which really freaked me out because

7  that told me that he'd been watching me all this time.  And

8  he -- like, it started off like some -- like it was a lady

9  saying, One of our father's friends said I should reach out to

10 you; and then it ended up with, But I know you'll just delete

11 it.

12            But the way my Facebook account is set up, I have to

13 either accept or decline a message if I don't have you as a

14 friend; so I read it, but I never accepted it.

15 Q     Other than your mom and her caregiver and this lawyer you

16 spoke to prior to speaking to Ms. Main, had you told anyone

17 else about the abuse you experienced as a child?

18 A     Really high level, I told my best friend.

19 Q     What did you tell her high level?

20 A     More about the mental and physical abuse.  Like I told

21 her that he did some un -- unusual sex stuff, but I never said

22 like what he did.

23 Q     Prior to today, did you discuss your testimony with your

24 mother?

25 A     Just really high level.

1    Q    Okay.  What did you talk about with your mother?

2    A    Well, back in April, I think it was right after I had

3    spoke with Amy for the interview, it was actually my mom's

4    birthday, it was April 13th, and I was calling my mom to wish

5    her a happy birthday because my mom and I, we don't speak a

6    whole lot.  I was calling to wish her a happy birthday and I

7    hadn't mentioned the case or anything because it was her

8    birthday and I didn't want to upset her, and then my mom asked

9    me how it was going and I told her that I didn't want to talk

10   about it because I didn't want to upset her.  And she made a

11   comment that it was actually one of the best days of her life

12   to hear that I could possibly bury my dad.

13   Q    And is that why you're testifying here today?

14   A    No.

15   Q    Why are you testifying here today?

16   A    Because I don't want to see anybody else get hurt.

17           MS. PENZA:  No further questions, Your Honor.

18           THE COURT:  All right, cross-examination.

19           MR. SOLOWAY:  Thank you.

20           Judge, is this podium affixed here or can I move it

21   back a little bit?

22           THE COURT:  No, it's not affixed, you can move it

23   wherever you like.

24           MR. SOLOWAY:  Thank you.

25                            ///

1   CROSS-EXAMINATION

2   BY MR. SOLOWAY:

3   Q    Good afternoon, Ms. Fuller.

4   A    Good afternoon.

5   Q    My name is Robert Soloway.  I am your father's lawyer.

6   Okay?

7   A    (Nodding.)

8   Q    And I am going to ask you a few questions.  So if you

9   don't understand a question I ask you, just please indicate

10  that to me and I will do my best to rephrase it or speak more

11  clearly or more loudly.  Okay?

12  A    Okay.

13  Q    When you were testifying just a couple of minutes ago,

14  one of the things that you said was that you spoke to both a

15  girlfriend, a best friend, and to your mother at something you

16  referred to as at a high level.

17              Right, do you remember saying that?

18  A    Yes.

19  Q    And when you say you spoke at a high level, do you mean

20  by that that it wasn't a very specific conversation, is that

21  what you mean or there wasn't a lot of detail?

22              Can you just explain to me what you mean by high

23  level in that context; do you know what I mean?  Do you know

24  what my question is?

25  A    Yes.  With my best friend when I say high level I just

N. Fuller - cross - Soloway                43

1   mean she knew that I had a really bad childhood, but prior to
2   being on the plane to come here today she knew nothing about
3   the sexual part.  She just knew that we moved a lot and that
4   about the abuse and the yelling and screaming.
5   Q     That is, she didn't know the details?
6   A     Correct.
7   Q     And when you spoke with your mother at a high level, you
8   were indicating also that she didn't know certain details, or
9   you meant something different when you used the word high
10  level there?
11  A     For my mom, as to the courts, as to being here, all my
12  mom knows is that I've had interviews and that I'm here today
13  to interview.
14  Q     And when you said that you spoke to this girlfriend, is
15  that a conversation that you had back in the time period when
16  you were living with your father in the San Diego area in
17  these hotels or that's a conversation you had with this
18  girlfriend more recently?
19  A     Much more recently.  I've only known her ten years.
20  Q     Okay.  So the activities and things that you are
21  testifying about involving the things you say your father did
22  in your presence and made you do, those things occurred back
23  in the 1990's, right?
24  A     Yes.
25  Q     You said that your grandmother, your father's mother,

N. Fuller - cross - Soloway                    44

1   died in April 1997, right?

2   A    Yes.

3   Q    And is it correct that your brother, Eric, was no longer

4   living in the home with you and your father in April 1997 when

5   your grandmother died?

6   A    I don't remember.  I thought it was afterwards.

7   Q    You thought he was still there when --

8   A    Yes --

9   Q    -- your grandmother died?

10  A    -- I thought he was still there or -- after my

11  grandmother died, no, he was --

12  Q    No, I'm sorry if I said that.  When your grandmother

13  died.

14  A    When my grandmother died, my brother was already gone.

15  Q    All right.

16  A    Sorry.

17  Q    So that is he had gone and went to move, I'm sorry, went

18  to live with your mother in Washington, right?

19  A    Yes.

20  Q    He was basically taken away by something like Child

21  Protective Services, right?

22  A    Something like that.  I don't know who, but yes, he was

23  gone.

24  Q    But in any event, he went and lived with your mother,

25  right?

1  A    Yes.

2  Q    And is it fair to say that at the time when your brother

3  went to live with your mother, that you were made aware or

4  became aware that you, too, could go and live with your mother

5  if you wanted at that time, that it was up to you?

6  A    I was never given the option.

7            MR. SOLOWAY:  Can I have a second here, Judge?

8            (Pause.)

9  BY MR. SOLOWAY:

10  Q    Now, when you say that you never had the option, do you

11  mean to say by that that your father didn't give you the

12  option or your mother didn't give you the option or someone

13  else didn't give you the option?

14  A    As far as at the same time my brother left or --

15  Q    Yes.  When you learned and became aware that your brother

16  had left to go live with his mother before your grandmother

17  died, are you saying that you didn't have the option to do

18  that because of your mother, your father or for some other

19  reason?

20  A    I -- I know I was never approached.  Later my mom tell me

21  that they asked her if she wanted to pursue taking me, and I

22  was two months away from -- or two or three months away from

23  graduation and my mom -- my grandmother was still alive and

24  she thought that I would be going off to college and she

25  didn't want to rip me out of the home.

N. Fuller - cross - Soloway                              46

1    Q    Okay.  Now, there came a time, Ms. Fuller, in 2017,

2    sometime around April, where you had an interview, that is you

3    were interviewed in a police station in Ohio by an agent or

4    someone affiliated with the government regarding this case,

5    right?

6    A    Yes.

7    Q    You remember that, right?

8    A    Yes.

9    Q    You sat with a woman who talked to you for a period of

10   time and told you she wanted you to do your best to tell her

11   the truth in response to the questions she was going to ask

12   you, right?

13   A    Yes.

14   Q    And those were questions she asked you about your father,

15   right?

16   A    Yes.

17   Q    And about growing up in your home and the things that you

18   experienced, right?

19   A    Yes.

20   Q    And you told her that you would do your best to tell the

21   truth, right?

22   A    Yes.

23

24              (Continued on the following page.)

25

SAM       OCR       RMR       CRR       RPR

1  EXAMINATION CONTINUES

2  BY MR. SOLOWAY:

3  Q    Now, one of the things, excuse me, that they asked you

4  about was your relationship with your father -- your brother's

5  relationship with your father, your mother's relationship with

6  your father, things like that; right?

7  A    Yes.

8  Q    And there came a time that you talked about -- and if you

9  don't remember you can say that -- your brother actually

10 leaving Arizona and going to live with your mother up in

11 Washington.  Do you remember talking about that?

12 A    I'm sure it came up.  I don't remember what was said but

13 I'm sure it came up.

14 Q    You don't remember specifically as you sit here today but

15 it wouldn't surprise you if that was one of the things you

16 talked about in that interview; right?

17 A    No, it wouldn't surprise me.

18         MR. SCHNEIDER:  Your Honor, do you have a copy of

19 that transcript with you the bench.

20         THE COURT:  I do not think there was a transcript,

21 if you recall --

22         MS. PENZA:  Your Honor, it was provided as 3500 and

23 F-2.

24         MR. SCHNEIDER:  I don't have a copy for the court,

25 but I'm going to ask Ms. Fuller --

N. Fuller - cross - Soloway                    48

1          MS. PENZA:  We provided a copy, but we're happy to

2    provide another one.

3          THE COURT:  I have it right here.

4    BY MR. SOLOWAY:

5    Q    I want to ask you, Ms. Fuller, when you indicate you did

6    not have a choice, I want to ask you about some of the

7    questions and answers that were put to you -- that is,

8    questions that you were asked and answers that you gave in

9    that interview.

10         Do you remember her name was Amy Allen, I think?

11   A    Yes.

12   Q    Right?

13   A    Yes.

14   Q    Do you remember that?  And the way that the interview

15   went is that you basically gave very long answers to kind of

16   short questions.  So, directing your attention -- I'm going to

17   direct your attention to an answer that you gave to a question

18   and this is on page 20 of the transcript just for the judge

19   and the lawyers.

20         The question occurs way back on page 17.  That's the

21   last question before the answer in which you are asked at line

22   420 -- I'm sorry, at line 419.  Just you're telling a story

23   and the question is, "Right, uh-huh," and then you continue.

24   You're talking about your life and your life with your parents

25   and you begin saying, I remember my parents would -- at that

1    point I was living with my grandparents, my dad's parents.

2    Okay.

3            And then you continue narrating the story of your

4    life for several pages.  And then at page 20, I want to ask

5    you if you remember giving this answer to the question that I

6    went back to a couple of seconds ago and the answer reads:

7            "And my brother actually went up to Washington state

8    to live with my mom and my mom -- they were asking if they

9    should take me, but my mom left it up to me and everything and

10   at this point we said no because I was, like, three months

11   away from graduating college -- high school and was supposed

12   to go to college."

13           And then it goes on and you talk about you being

14   underage and how you ended up not going to college.  But do

15   you remember giving that answer to, again, that question that

16   happened pages and pages earlier, and if you want I will show

17   it to you.  Do you remember giving that answer in which you

18   indicated that your mom left it up to you as to whether you

19   wanted to go and live with her in Washington like your brother

20   did?

21   A    I can't tell you word for word what I said.  I know we

22   talked about the subject but like everything else when I first

23   started interviewing with Amy, my memories of everything

24   weren't nearly as clear.

25   Q    Okay.  And I just want to be clear.  I'm not asking you

1    to give, like, a recital that would be word for word.  You

2    know, we're really talking here about the sum and substance of

3    what you were communicating.  Okay?

4            So right now here in court you are saying that you

5    didn't have a choice at this time in your life when your

6    brother left in -- some time before April 1997.

7            Now, in April of 1997, you were 16 years old; right?

8    A    Yes.

9    Q    Because you were going to turn 17 this June of 1997,

10   right?

11   A    Yes.

12   Q    So as of April you were 16 years old, and you said that

13   you had no choice, but, again, do you remember not exactly

14   word for word but in -- sort of in substance the sense of what

15   you were saying, telling Ms. Alan in that interview that my

16   brother actually went to Washington state to live with my mom

17   and my mom -- they were asking if they should take me and my

18   mom left it up to me and everything and at this point we said

19   no because I was, like, three months away from graduating high

20   school, do you remember giving that answer that has -- whether

21   it's word for word or not, a very clear meaning?

22   A    I mean, it all matches, but I do not remember ever being

23   asked.  I remember my mom telling me after I went up to live

24   with her.

25   Q    You remember your mom asked after you went up to live

1    with her what?

2    A    She -- she -- she told me after I went up to live with

3    her that they had given her the option to fight for me and she

4    chose not to.

5    Q    That's what your mom told you?

6    A    Yes, after I went through everything.

7    Q    And she was referring to this time around when your

8    brother came to live with her?

9    A    Yes.

10   Q    Now here, Ms. Fuller, you have said that it sounds like

11   what happened in California in those hotel rooms and I have to

12   ask you about some of the things you say your father did.

13            You indicated that I think you said on your

14   testimony that your father actually had you touch him in this

15   California hotel two of the times where this occurred where

16   these pornos were playing and you were in, it sounds like, a

17   standard hotel room with one king sized bed.  Am I correct or

18   did I get that wrong?

19   A    That's correct.

20   Q    And you said that at the time in Arizona before you came

21   to California that he did this thing with a string one time,

22   and you stayed in a room something like three nights; is that

23   correct?

24   A    Yes.

25   Q    And you said that he played porno movies more than two

N. Fuller - cross - Soloway                    52

1    times when you were in California, right?

2    A     Yes.

3    Q     But the touching only occurred two times?

4    A     Yes.

5    Q     Your touching?

6    A     Yes.

7    Q     I'm sorry; right?

8    A     Right, I only touched once.

9    Q     Right, okay.  Now, one of the things that you mentioned

10   is that your father, you said, followed you to you Washington

11   after you advised him that you weren't going to return to live

12   with him; right?

13   A     Yes.

14   Q     And that when there -- when your child was born, your

15   father said to you something like, I'm not going to have

16   this -- this child, bastard child, carrying on my name,

17   something like that?

18   A     Yes, while I was pregnant.

19   Q     That was while you was pregnant that he did that?

20   A     Yes.

21   Q     And you said that you took some kind of action to have or

22   try to have your father be required to stay away from you

23   because of these words that he said to you about the baby or

24   the coming baby; right?

25   A     Yes.

N. Fuller - cross - Soloway                    53

1  Q    And prior to -- now, you said that what you did was that

2  you got some kind of -- did you get some kind of order?

3  A    I don't remember if it ever actually ever got officially

4  made -- I know they approved it, but I also remember being

5  told that they couldn't locate him to serve him.

6  Q    Well, didn't you, again in this interview that you gave

7  to Amy Allen back in the Ohio police station, claim that you

8  reported to the Long Beach Police Department in the state of

9  Washington that your father had somehow threatened you or

10 threatened the life of the baby and that you went to that

11 police department and got a restraining order?

12 A    Yes, that -- we did.  I just don't remember if it was

13 ever actually issued.

14 Q    And -- now, I want to just ask you again about what --

15 okay, I'm just going to direct your attention to -- I'm going

16 to ask you to listen to some questions and answers that you

17 gave back in April at the police station to Amy Allen and so

18 you can think about them for a second.

19        Starting on page 53, line 1323.  I'm just going to

20 read you some questions and answers from that interview in

21 Ohio; okay?

22 A    Okay.

23 Q    "Question:  Were he and your mom ever" -- something is

24 unintelligible.

25        "Answer:  No.  When they got divorced for good I was

N. Fuller - cross - Soloway                    54

1   12 and they never spoke again.

2          "Question:  And so" --

3          MS. PENZA:  Objection, Your Honor.  The line is

4   indiscernible.  So we don't know what that sentence says.

5          MR. SOLOWAY:  What did I say?

6          THE COURT:  You left out the word "indiscernible."

7          MS. PENZA:  It sounds like the end of the sentence

8   and we don't know what the meaning of that sentence is.

9          MR. SOLOWAY:  I have no problem with that.

10  BY MR. SOLOWAY:

11  Q   "Question:  And, so, when he's living two doors down it

12  never --

13          "Answer:  Yeah.  It wasn't good" --

14          MR. SOLOWAY:  I'm sorry, I'm sorry.  I'm reading in

15  the wrong place.  I want to start at line 13 02.  I apologize,

16  Judge.

17          THE COURT:  Where are you?

18          MR. SOLOWAY:  I'm at page 53, line 1302.

19          THE COURT:  Okay.

20  Q   "Question" --

21          THE COURT:  I want to tell the witness that at some

22  time when the recording of this interview was made, the

23  recording could not pick up certain things that you or the

24  questioner said.  When that happened, it shows up in the

25  transcript as "indiscernible."

1           So when Mr. Soloway is asking you these questions,

2    if he says "indiscernible" that means something was left out

3    of the question or answer because it was not clear from the

4    recording.

5           Do you understand?

6           THE WITNESS:  Yes.

7           THE COURT:  Go ahead.

8    BY MR. SOLOWAY:

9    Q    Question at line 1302, page 53:

10          "Question:  And then you said he threatened

11   because" -- and something was indiscernible so that means it

12   couldn't be made out by the person transcribing this.

13          "And then you said you threatened because --"

14   indiscernible, "about her name?

15          "Answer:  Well, because her dad left me when I was

16   pregnant -- when I wanted an abortion, he left.  So when she

17   was born and my dad was living down the -- two doors down,

18   we'd been trying to get him -- we'd been trying to get him to

19   live us alone and he wouldn't.  And then because I left him,"

20   something is indiscernible, "these bad things against me, he

21   just -- I remember him saying, I don't want that bastard baby

22   to carry on our name.  So --"

23          "Question:  And then what police department did you

24   report that to?

25          "Answer:  It would have been the Long Beach Police

1    Department."

2           Do you remember giving those answers to those

3    questions when Amy Allen was interviewing you?

4    A    I remember answering them.

5    Q    Okay.  And when you were answering them, were you doing

6    your best to remember as best you could and tell the truth as

7    best you could?

8    A    Yes, of course.

9    Q    Okay.  And so is it correct that you reported this

10   conduct of your father to the Long Beach Police Department?

11   A    That's what I remember.

12   Q    Okay.  So, now, did you obtain some kind of order when

13   you made this report to the Long Beach Police Department that

14   referred to your father not being able to come around you or

15   being limited in the way he could make contact with you?

16   A    I know we tried to get one.  I can't remember if it ever

17   actually got served.

18   Q    Okay.  Well, turn to another section of this transcript

19   at page 58, line 1447.  I'm going to ask you whether you

20   remember these questions and answers:

21          "Question:  And that little town that you reported

22   those restraining orders to in Washington state, again is

23   Lake --

24          "Answer:  Long Beach.

25          "Question:  Long Beach.  Okay.

1    "Answer:  Yeah, Longview is the bigger city.  Long
2  Beach.  It should be Long Beach.
3    "Question:  They never gave you one on dad just,
4  like, following you around but gave you one on the --"
5  indiscernible "-- with the baby?
6    "Answer:  Yeah.  When -- yeah, I guess that was
7  enough to finally get them to do it.
8    "Question:  Got it."
9    That's the questioner saying, "Got it."
10   "Answer:  It was only good for a year.  I'm not sure
11 if it was -- it might have mentioned a temporary one,
12 honestly, I don't know, because it was just so long ago.  I
13 remember it was just good for a year and then when they went
14 to try to serve him again they couldn't find him and there was
15 no --" and then it's indiscernible.
16   Do you remember giving those answers to those
17 questions?
18 A    I remember answering the questions.
19 Q    So, Ms. Fuller, weren't you indicating in those answers
20 that it was good for a year and when they tried to serve him
21 the second time after that first year, that's when they
22 couldn't find him to serve him?  Was that the meaning of what
23 you were trying to communicate there?
24 A    At that time, yes.
25 Q    Okay.  And are you aware -- well, do you have a copy of

1    that order that you say you obtained?

2    A    No.

3    Q    No.  Was it something that maybe the prosecutor or

4    probation officer or Amy Allen ever asked you if you could

5    find or dig up or locate somehow?

6    A    No.

7    Q    Did anybody ever ask you to look for it?

8    A    No.

9    Q    Do you ever remember actually having it in your hand at

10   any time in your possession?

11   A    No.

12   Q    You but you say that -- your best recollection is that it

13   was good for a year?

14   A    When we talked to the police department, I was told

15   that's what it would be but as far as it being -- them being

16   able to locate him to serve him, I can't remember if it was

17   for that one or for it to be -- when it was renewed.

18   Q    Okay.  And when you made this complaint or this report,

19   did you actually physically go to the police station to do

20   that?

21   A    Yes.

22   Q    And did you go personally to the police station by

23   yourself or with anybody?

24   A    My mom would have been with me.

25   Q    Do you remember specifically your mom going with you?

1  A    Not specifically, but my mom and I were always together
2  because of her health.
3  Q    So it was the kind of thing that she definitely would
4  have gone with you to do?
5  A    More than likely.
6  Q    So, your mom.  And what about when your dad made this
7  threat to you that you claim he made or referred to this baby,
8  this coming baby, was anybody present when he said that to
9  you?
10  A    Not that I remember.
11  Q    Okay.  And the baby was born in 2000 or 2001?
12  A    2001.
13  Q    And are you aware in any way that there's no record that
14  anybody -- there's no copy of that restraining -- have you
15  seen a copy of that restraining order ever in your life?
16  A    Not that I remember.
17  Q    Are you in any way aware that there's not a single report
18  among the Long Beach Police Department official records of you
19  making this complaint that you say resulted in this
20  restraining order?  There's not one police report that reflect
21  you or your mother or anybody else coming in and making this
22  particular complaint against your father; do you know that
23  there's no such report or no?
24  A    No.
25  Q    I mean, there are -- you've had contact with the Long

1    Beach Police Department during the time that you lived there

2    that had nothing to do with your father at times; right?

3    A    Not that I remember.

4    Q    Well, did you have some troubles with Chris Gibson during

5    some periods of time in your life that you involved the police

6    if?

7    A    That's my daughter's dad and the only thing that was

8    ever -- I remember is just when the state issued child

9    support.

10   Q    How about when you and your mother complained to the Long

11   Beach Police Department that Chris Gibson had stolen from you

12   a Coleman lantern, wouldn't provide you with a cradle that was

13   yours that you wanted to use for the baby?  Do you remember

14   making complaints that Chris Gibson stole a sleeping bag from

15   you?  So we're talking about a sleeping bag, a Coleman lamp

16   and a cradle.

17          Do you remember making complaints to the police that

18   he had those things, he wouldn't give them to you and you

19   wanted them back?

20   A    No, I don't remember that at all.

21   Q    Okay.

22          MR. SOLOWAY:  I'm going to ask us have reports that

23   were supplied by the government marked.  Should I give them to

24   the reporter or shall we deem them marked and give them to the

25   witness?

N. Fuller - cross - Soloway                    61

1        THE COURT:  You can put a sticker on them and then

2   they are marked.  Then you can show them to the witness.

3        Should we take a break for lunch and then you can

4   put stickers on them during lunch?

5        MR. SOLOWAY:  That would be fine, Judge.  I didn't

6   pre-mark things so, yes.

7        THE COURT:  Okay.  Let's break until 1:45.  See you

8   back then.

9

10        (Continued on following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N. Fuller - cross - Soloway                    62

1                    AFTERNOON SESSION:

2              (In open court.)

3              (Judge BRIAN M. COGAN enters the courtroom.)

4              THE COURTROOM DEPUTY:  All rise.

5              THE COURT:  Be seated, please.

6              Let's have the witness back.

7              (Defendant enters the courtroom.)

8              (Witness resumes stand.)

9              THE COURT:  Mr. Soloway, you may continue.

10   CROSS-EXAMINATION

11   BY MR. SOLOWAY:

12   Q    Good afternoon, Ms. Fuller.

13         So, when we broke I was asking you about some

14   contacts that I -- suggesting that you had with the Long Beach

15   Police Department in connection with the father of your child.

16         Do you remember that?

17   A    Yes.

18   Q    Yes.  And I was asking you that, in connection with your

19   statement, that you went to the Long Beach Police Department

20   and you got a restraining order against your father, right?

21   A    Yes.

22   Q    And are you saying now that you are not sure that you got

23   a restraining order against your father at the Long Beach

24   Police Department?  Just so I'm clear.

25   A    I know I tried to get one and, but I was told that they

N. Fuller - cross - Soloway                    63

1   couldn't serve him because they couldn't locate him.

2   Q    And were you told that immediately when you first got the

3   restraining order or a year later?

4   A    I don't remember.

5   Q    Okay.  So, I was just asking you about whether you had

6   had contacts with that police department and you were familiar

7   with them and they were familiar with you.

8          And would you say that's the case; is that there

9   were times when you had contact with the Police Department of

10  Long Beach that had nothing to do with your father?

11  A    Not that I remember.

12  Q    Okay.

13         MR. SOLOWAY:  I have what is marked here Defense

14  Exhibit 1, Your Honor.  I'd like to show it to the witness, if

15  I could.

16         I will show it to the Government.  And I will show

17  two at the same time, if I could, just to move it along here.

18         THE COURT:  Okay.

19         MS. PENZA:  No objection.

20         MR. SOLOWAY:  Can I approach the witness?

21         THE COURT:  You may.

22         MR. SOLOWAY:  These two pieces of paper, ma'am, have

23  been marked.  I'm just going to ask you to take a moment and

24  read them, if you would, and just let me know when you are

25  finished.

1                (Pause in the proceedings.)

2    A    Okay.

3    Q    You read them both?

4    A    Yes.

5    Q    Have you ever seen that kind of document before?

6    A    No.

7    Q    Okay.  But were you able to read the description section

8    of the document and understand what it said?

9    A    Yes.

10   Q    Okay.  And you said that you didn't remember having

11   interaction the with the police department in connection with

12   the father of your child, Mr. Gibson.

13            Does that happen to refresh your recollection that

14   you did have contacts with the police department?

15   A    No.

16   Q    It doesn't refresh your recollection?

17   A    No.

18   Q    Okay.  Did you have a situation with Chris Gibson in

19   which you, he moved out of -- well.  Let me back up for a

20   second.

21            There was a time when you and Chris Gibson in 2000

22   lived together somewhere in this area of Long Beach?

23   A    Yes.

24   Q    And I think you said on direct there came a time that you

25   and him broke up over a matter relating to your pregnancy and

1   you moved back in with your mother, right?

2   A    Yes.

3   Q    And was there a time when you had a problem because

4   Mr. Gibson removed some things that didn't belong to him, but

5   rather belonged to you; specifically, a sleeping bag and a

6   Coleman stove?

7   A    Not that I remember.

8   Q    Okay.  And again, this document does not refresh your

9   recollection about that?

10  A    No.

11  Q    And that's the same we can say about any contact you

12  might have had with respect to a baby cradle that was in a

13  storage shed that you wanted back from Chris Gibson.

14       You don't have any recollection of that?

15  A    No.

16       MR. SOLOWAY:  I'm going to just take those back from

17  you if I could.  Thank you.

18  Q    When you were living up there in Long Beach, was your

19  brother Eric also living there?

20  A    No.

21  Q    Okay.  Did you ever see Eric during any of the period of

22  time that you were living up in Long Beach?

23  A    I don't remember.

24  Q    Okay.  One of the things you said that happened when you

25  went up to Washington to live with your mother is that there

1  came a time that you opened up to your mom and told her what

2  your father made you do to him, right?

3  A     Just, just very basic.

4  Q     High-level?

5  A     Yes.

6  Q     Right, okay.

7            And now you're saying that what happened at that

8  point when you made this communication to her at this

9  high level, was that you and her went and sought the advice of

10 a lawyer; is that right?

11 A     Yes.

12 Q     And that's your recollection now?

13 A     That's my recollection.

14 Q     And that wasn't your recollection when you were

15 interviewed by Amy Allen; correct?

16 A     No.

17 Q     And have you had an opportunity to review the transcript

18 of your interview with Amy Allen?

19 A     No.

20 Q     Okay.  Have you had an opportunity to talk to the

21 Assistant United States Attorney or to anybody in the

22 Government -- I don't mean to point, but I am referring to

23 Ms. Penza -- about some of the contents of that interview with

24 Amy Allen?

25 A     We spoke briefly.

1    Q    You spoke briefly about some of the contents, some of the

2    things that you were asked that you said to Ms. Allen?

3    A    Yes.

4    Q    And was one of the things that you talked about with the

5    prosecutor or with anybody from the Government the fact that

6    you told Amy Allen very clearly that when you opened up, when

7    you told your mother about what you are father did, what you

8    claim your father did to you, that she took you to the police

9    department to make a police complaint.

10        Are you aware that that's what you told Amy Allen?

11   A    Yes.

12   Q    And did you have conversations with anyone in the

13   Government about that before coming here to testify today?

14   A    I honestly don't remember.  We talked about some stuff.

15   Q    Because you're now saying that just didn't happen.  The

16   interview was in April 2017, just a few months ago, five

17   months ago.  And now what you're saying is you didn't go to

18   the police but rather that you went to a lawyer, right?

19   A    Yes.

20   Q    Okay.

21   A    I mean, I've had to relive this several times over.  As I

22   spoke to people, my memory becomes clearer.

23   Q    Yes.  And again, just so I do not have to read the

24   transcript, we can agree that you told Amy Allen in your

25   interview where she asked you to do your best to tell the

1    truth, that when you told your mom, she took you to the

2    Long Beach Police Station.

3            That's what you said at that time in April, right?

4    A    At that time.

5    Q    Yes.  And have you been made aware that there are no

6    police reports of the kind that I just showed you, like

7    Long Beach Police Department forms, containing complaints that

8    people made to the police?

9            Have you been made aware that there are no police

10   reports about you ever saying that your father made you do

11   these sort of sexual things to you?

12   A    I'm not aware, but like I said, I know now that I spoke

13   to the attorney instead.

14   Q    I see.  Okay.

15           Now, do you know that when you were living up in

16   Washington with your mother, you say you didn't see your

17   brother, but were you aware that he was actually living in

18   that community as well and also living with your father for a

19   period of time?

20   A    I did not know he was living with my father, but I knew

21   he was in the area.

22   Q    Okay.  Now, you are saying that the things that you told

23   your mother were what you've described as being on a high

24   level but would you say, Ms. Fuller, that included in what you

25   told her was something about your father making you do

N. Fuller - cross - Soloway                69

1    something with, you know, a shoe string on him?

2    A    I mentioned to my mother that he had a shoe string that

3    he liked to use.  I never mentioned to her that I had to use

4    it.  I just said that he had a string he liked to use.

5    Q    And in other words, you are saying that you didn't tell

6    your mother that you actually had to do something with that

7    shoe string in connection with his body?

8    A    Not to my mother.

9    Q    You never told your mother that.

10            Did there come a time that you became -- so, you

11   didn't tell your mother; you mentioned a shoe string but you

12   never mentioned to your mother that you were actually

13   instructed or made to do something with that shoe string by

14   your father on him; correct?

15   A    Right.

16   Q    Okay.  And did you ever tell your mother that you were

17   forced to perform fellatio on him?  Did you ever tell your

18   mother that?

19            Do you know what fellatio is?

20   A    No, sir.

21   Q    Okay.  I think the common street term for it is a

22   blow-job, like your mouth.

23            Have you heard that term?

24   A    Yes.

25   Q    Okay, I'm sorry.

N. Fuller - cross - Soloway                    70

1         So, did you ever tell your mother that you were

2    forced to do that to him?

3    A    No.

4    Q    Did you ever become aware that your mother had informed

5    the United States Probation Department that the sexual kind of

6    thing that he forced you to do was that, what I just said?

7    A    No.

8    Q    You are not aware that that's what your mother told

9    Victoria that you told her your father made you do?

10   A    No.

11   Q    Okay.  Now, when you were in California in this hotel,

12   during that period of time, are you sure that you were 17 when

13   this activity was going on?

14   A    I'm not absolutely positive, but by the dates, I would

15   have -- I have to have been.

16   Q    Well, did you have a conversation at some point in

17   August with Amy Allen, like a telephone conversation, in which

18   you said to her that during the incident in San Diego you

19   would have been age 17 to 18 years old, just sort of

20   suggesting that you weren't really sure.

21   A    I know it was late 17.

22   Q    Okay.  So, did you tell Amy Allen -- now you know that

23   you would have been 17, but when you spoke to Amy Allen on

24   August 1st -- by the way, do you remember speaking to Amy

25   Allen sometime about a month and a few days ago, August 1st,

N. Fuller - cross - Soloway                 71

1    2017, about the sort of the timing of things and telling her

2    that the second incident of abuse, not the Arizona one but the

3    San Diego one, you would have been aged 17 to 18 years old?

4    A    I remember speaking to Amy several times, but I can't

5    tell you when or exactly what was said each time.

6    Q    And when you went to your mother's in Washington, it was

7    well into you being more than 18 years old at that time,

8    right?

9    A    Yes.

10   Q    It was in like May of '99 that you went to your mom's?

11   A    Yes.

12   Q    Right.  And in May of '99, you were 19-going-to-be-20 in

13   one month, right?

14   A    No.

15   Q    I'm sorry, you were 18, and going to be -- forgive me.

16         In June of '99 you would be 19?

17   A    Yes.

18   Q    In May of '99, obviously, you were 18 and that's when you

19   went to your mother and didn't return, right?

20   A    Yes.

21   Q    Okay.  So, you were with your father continuously in

22   California through the period in 1999 up until May when you

23   left to go to your mother?

24   A    Yes.

25   Q    Okay.  And so, for a chunk of that time, from June 30th,

1  1998 forward, you were 18 throughout that period of time with

2  your father in California, right?

3  A     Yes.

4  Q     Okay.

5            MR. SOLOWAY:  I have no further questions for the

6  witness, Judge, but there is a document I would like to put

7  in, in the hearing, before we close or before I rest.

8            THE COURT:  Sure.  Do you want to do that now?

9            MR. SOLOWAY:  Yes.

10            THE COURT:  Why don't we get the witness off the

11  stand.

12            Is there any redirect?

13            MR. SOLOWAY:  Oh, yes.

14            MS. PENZA:  May I have one second, Your Honor?

15            (Pause in the proceedings.)

16            MS. PENZA:  Just briefly, Your Honor, may I inquire?

17            THE COURT:  Yes.

18  REDIRECT EXAMINATION

19  BY MS. PENZA:

20  Q     Hello, Ms. Fuller.

21            I just wanted to go back to when you were in Idaho

22  with your father and Gerri, okay?

23  A     Okay.

24  Q     When you attended the Christmas Eve mass, what year was

25  that and how old were you?

1    A     '97 and I was 17.

2    Q     And how long after that did Gerri leave your father?

3    A     Within a couple months.

4    Q     Okay.

5          Can you tell me about the, did Gerri tell you that

6    she was leaving?

7    A     Yes.

8    Q     Can you tell me about that conversation?

9    A     I don't know where my father was, but Gerri and I were

10   standing in the living room and she told me that she was

11   sorry, but she just couldn't take it anymore and that she was

12   going back home, and she wanted to take me with her, she

13   wished she could take me with her, but that I was 17 and my

14   dad would file kidnapping charges, and she just couldn't deal

15   with that.  So, she had no choice but to leave me behind.

16   Q     And what were your emotions during that conversation,

17   yours and hers?

18   A     We were both crying.

19   Q     And how long after that did you move with your father to

20   San Diego?

21   A     Within a month or two.

22   Q     Is your memory clear today about what happened in the

23   hotel room in Arizona?

24   A     Yes.

25   Q     And is your memory clear today about what happened in the

Proceedings                                      74

1    hotel room in San Diego?

2    A      Yes.

3              MS. PENZA:  No further questions, Your Honor.

4              THE COURT:  Okay.

5              You may step down, thank you.

6              (Witness excused.)

7              THE COURT:  Mr. Soloway, do you want to do that

8    document now or would you like to wait?

9              MR. SOLOWAY:  No, I would like do that now, Judge.

10             THE COURT:  Okay.

11             MR. SOLOWAY:  Do you have an objection to this

12   document?

13             MS. PENZA:  Your Honor, we have no objection.

14             The Government would ask that all the documents that

15   have been appended to the Government's letters, which include

16   this document, be admitted for the purposes of the Fatico.

17             THE COURT:  I kind of assumed that.

18             MR. SOLOWAY:  I don't have any objection to that.

19             THE COURT:  So, the documents that have been

20   submitted are included in the record.

21             So, the next question is, having made that

22   observation that everything is admitted that has been

23   submitted, does the Government have anything more on the

24   medical issue -- well, first of all, on this issue that we

25   just heard about.

Proceedings                              75

1          MS. PENZA:  Your Honor, I have, I'm sorry I don't

2   have Exhibit stickers with me, there are a few items that I

3   would like to add to the record.

4          THE COURT:  Ms. Clarke will hand you Exhibit

5   stickers.

6          MS. PENZA:  Thank you very much.

7          Your Honor, I would like to admit for the record a

8   copy of the front page of the Santa Cruz High School year book

9   from 1996 through 1997, which includes a picture of Nanette

10  Fuller.  If called to do so, Special Agent Mullen would be

11  able to testify that he spoke to someone at the Sheriff's

12  office in Arizona, and that they had attended high school with

13  Ms. Fuller, and that this was a copy of the year book showing

14  that she had graduated in 1997.

15         THE COURT:  Okay.

16         MS. PENZA:  That is Government's Exhibit 1.

17         (Government's Exhibit 1 received in evidence.)

18         MS. PENZA:  I'd like to put in as Government's

19  Exhibit 2, this is a copy of the, the Government has already

20  submitted sanitized versions of e-mails.  This is a copy of

21  the pornographic images that were attached to some of the

22  e-mails.

23         THE COURT:  Hang on because now you are going

24  further than I wanted to go at this point.

25         MS. PENZA:  I'm sorry, Your Honor.

```
                        Proceedings                    76
```

1            THE COURT:  At the moment, I just wanted to go to

2    the incident with the daughter.

3            Is there anything else on that?

4            MS. PENZA:  No, I think just the year book.

5            THE COURT:  Okay.

6            Is there anything else on the malingering issue?

7            MS. PENZA:  No, Your Honor.

8            THE COURT:  Okay.

9            So now, tell me; let's go down the open facts and

10   make sure we are on the same page as to what you are

11   addressing by these various submissions because having them in

12   the record and not knowing what they are supposed to say does

13   not do me much good.

14           So let me give you my list first, and this is based

15   on Mr. Schneider's letter when he pointed out a number of

16   things in the PSR that the defendant denies.

17           First, is paragraph 3 of the PSR, which references

18   e-mails from the NCMEC.

19           Is that what you are about to mark?

20           MS. PENZA:  Yes, Your Honor.

21           THE COURT:  Okay.  Well, then we are going to order.

22           MS. PENZA:  So, I will mark as Government's

23   Exhibit 2 a copy of the e-mails, as well as the attachments.

24   Some of the attachments, the full pages have been cut off and

25   therefore, some of the portions, including the genitalia of

Proceedings                                                77

1    some of the subjects, is not included in the portions, but

2    there are smaller...

3              THE COURT:  Thumbnails.

4              MS. PENZA:  Thumbnails, I'm sorry, Your Honor, that

5    do show the entire body.

6              I've also included in the same binder some of the

7    other child pornography that was found on the defendant's

8    computer, including some of the more violent images.

9              THE COURT:  Okay.

10             (Government's Exhibit 2 received in evidence.)

11             THE COURT:  Are any other Exhibits you have

12   addressed to this dispute over paragraph 3 of the PSR?

13             MS. PENZA:  No, Your Honor.

14             THE COURT:  Okay.

15             Then let's go to paragraphs 4 and 5.

16             I am not sure I understand the defendant's denial of

17   those paragraphs.  I guess I should ask you, Mr. Soloway,

18   what, if anything, is the defendant continuing to dispute in

19   paragraphs 4 and 5?

20

21             (Continued on following page.)

22

23

24

25

VB        OCR        CRR

```
                         Proceedings                    78
```

1   (Continuing)

2           MR. SOLOWAY:  Judge, I think the nature of the

3   objection arises from Mr. Fuller's belief that he's

4   characterized here as, basically, a homeless person or a

5   person without -- and that's specifically what the objection

6   is.

7           In terms of --

8           THE COURT:  Well, I am not going --

9           MR. SOLOWAY:  -- him identifying the fact that he

10  did accurately describe his residence history after being

11  stopped at JFK, so what exactly -- I'm sorry, Judge, maybe I

12  should address what you are --

13          THE COURT:  I just know that this was one of the

14  items in Mr. Schneider's letter in which he said the defendant

15  does not agree --

16          MR. SOLOWAY:  Right.

17          THE COURT:  -- with paragraphs 4 and 5.

18          MR. SOLOWAY:  And he doesn't.

19          THE COURT:  So I am just asking why.

20          MR. SOLOWAY:  I think I'm trying.  Because

21  Mr. Fuller regards the paragraphs as reflecting that he is --

22          THE DEFENDANT:  Homeless.

23          MR. SOLOWAY:  Yes, I think is basically homeless,

24  whereas that's not correct.

25          THE COURT:  Well, I do not think the Government is

Proceedings                                              79

1   asking me to draw an inference that he is homeless.

2            Is the Government asking me to draw that inference?

3            MS. PENZA:  No, Your Honor.

4            THE COURT:  I have no interest in drawing that

5   inference.

6            Is there anything in paragraphs 4 and 5 that is

7   wrong?

8            MR. SOLOWAY:  I would say no, Judge.  The fact that,

9   I guess, it's perceived that way by the defendant, by

10  Mr. Fuller in some way doesn't give rise to an argument that

11  there is factual -- that there is factual errors there.

12           THE COURT:  Okay.

13           THE DEFENDANT:  Your Honor, it says I resided in

14  various hotels.  That's untrue.

15           THE COURT:  Okay.

16           Well, does the Government want to prove that he has

17  resided in various hotels, at least that is what he told the

18  agent at JFK?

19           MS. PENZA:  Yes, Your Honor, we are happy to do so.

20  If you give me one second, please.

21           THE COURT:  Sure.

22           MS. PENZA:  Thank you.

23           THE COURT:  I mean I have to tell you it is going to

24  take quite a while to go through all Mr. Schneider's

25  objections at this rate.  I would have expected the parties to

SAM      OCR      RMR      CRR      RPR

Proceedings                                          80

1   get it together.  These are factual disputes that the

2   defendant has raised.  Some of them he may want to back off

3   because it is not important.  Some of them he may want to

4   insist that we have a hearing on, but I will have a n hearing

5   on every one that the Government thinks might be worth

6   pursuing.

7               MS. PENZA:  Your Honor, I am sorry.

8               My understanding from the objection letter from

9   Mr. Schneider was not that he was objecting to him having

10  stayed at hotels, so I do apologize for not being prepared on

11  that.

12              THE COURT:  Well, that is true.  It was not clear

13  what the objection was.

14              (Pause.)

15              MS. PENZA:  Your Honor, I am happy to put Special

16  Agent Mullen on the stand.  I do not have his original report

17  with me, but he would, I can proffer that he would testify

18  that Mr. Fuller did tell him that he resided in various

19  hotels.

20              THE COURT:  Well, I think there might be a number of

21  matters that you want to put him on the stand for, so put that

22  in your notes.

23              MS. PENZA:  Okay.

24              THE COURT:  We have an ongoing dispute as to

25  paragraphs 4 and 5.

Proceedings                         81

1          Look, I take the PSR very seriously and I take the

2     defendant's right to object to statements in the PSR very

3     seriously.  If the defendant objects to a statement in the

4     PSR, I am going to find out whether it was true or not by a

5     preponderance of evidence.

6          And by the way, the issue is not whether he resided

7     in various hotels, the issue is whether he told the agent he

8     resided in various hotels.

9          MR. SOLOWAY:  You know, Judge, I am just going to

10    make a suggestion.

11         THE COURT:  Okay.

12         MR. SOLOWAY:  You know, I know I joined in

13    Mr. Schneider's letter in the submission that I made.

14         THE COURT:  Yes, you did.

15         MR. SOLOWAY:  Yes.  And since then, you know, there

16    have been submissions relating to various matters.  To be

17    clear with the Court, candid with the Court, of course, you

18    know, I really haven't gone through, as I should have, the

19    details of these objections.

20         You know, I think that we might be able, however,

21    to -- and I think that, you know, if she is going to put on

22    the agent on issues like this, it is going to raise 3500

23    material issues.

24         THE COURT:  Look, I expect Mr. Schneider might have

25    had some suggestion from his client as to what to object to --

Proceedings                                          82

1          MR. SOLOWAY:  It would seem so.

2          THE COURT:  -- and it may be that with abundant

3  counseling the defendant could come away thinking, well, maybe

4  that is not worth objecting to.

5          MR. SOLOWAY:  Right.

6          THE COURT:  If you would like the opportunity to

7  have a conversation, we will put this off until you do.

8          MR. SOLOWAY:  Okay.

9          THE COURT:  But I do want to go through, and we DO

10  not have to have the back and forth, I just want to identify

11  what the issues are as I see them.  Then you can confer with

12  Mr. Fuller, you can confer with the Government, and next time

13  we convene we will get to what I thought we would today, which

14  is what is really in dispute.  And if it is in dispute, how is

15  the Government to prove it because it is the Government's

16  burden on all of these statements.

17              Now, I think the next one, for example,

18  Mr. Schneider says he looked through the photographs and he

19  thinks most of them are not child pornography, most are child

20  erotica.  Well, if I have got to look at 1588 images of child

21  pornography alleged and 678,287 of erotica alleged I will do

22  that, but I think you all ought to do that, see if you have a

23  disagreement, and then show me the pictures on which you

24  disagree.  Okay?  Because I am going to find facts based on

25  the PSR unless the Government withdraws an allegation of the

Proceedings                                    83

1    PSR, which it is also free to do.  I am not asking the

2    Government to do that, I am just saying this is the process by

3    which you resolve disputes to factual allegations in the PSR.

4             MS. PENZA:  Your Honor, I don't think there's any --

5    the Government's position regarding paragraph 8, we have

6    always offered to make the images accessible to Mr. Soloway.

7    In fact, I believe there was even a -- he even made

8    discussions -- had discussions with the agent.  So right now

9    the Government has presented some of the more violent images.

10   They are only some of the 1588 images of child pornography.

11            We have no objection to the math that Mr. Schneider

12   did if there were 678,000 images of child erotica as well, but

13   it is not really an objection.

14            THE COURT:  Okay, so you are willing to go along

15   with Mr. Schneider's recharacterization of that paragraph, is

16   that right?

17            MS. PENZA:  Your Honor, I just -- it doesn't sound

18   like an objection.  It's not a recharacter -- I am happy to

19   argue that ultimately what Mr. -- no, I am not happy to go

20   along with Mr. Schneider's recharacterization, but what I can

21   tell you is that the images -- that there are child images

22   that are child pornography.

23            I have no idea what Mr. Schneider meant when he

24   wrote:  Very few of the images viewed by counsel at that time

25   appeared to meet the legal standard for child pornography,

Proceedings                                          84

1   though some are obviously child pornography under the

2   statutory definition.

3          THE COURT:  Well, I guess it is true that I could

4   overrule the objection on the ground that he does not appear

5   to have looked at everything and is just noting that the ones

6   he looked at were mostly not child pornography.  I am not sure

7   that is relevant.

8          MS. PENZA:  Well, Your Honor, right in Government

9   Exhibit 2 you can see images of pre-pubescent children being

10  penetrated by adult men.

11         THE COURT:  Look, the question is, is paragraph 8

12  correct?

13         Paragraph 8 says there is 1588 images of child

14  pornography, 678,287 images of erotica where the age of the

15  victim was difficult to determine, and ten video files

16  containing child pornography.

17         Does the defendant dispute that?

18         THE DEFENDANT:  I'm sorry, sir?

19         THE COURT:  I am asking your lawyer.

20         Does the defendant dispute the numbers and the

21  description of those numbers set forth in paragraph 8?

22         Mr. Schneider's objection suggests there is some

23  dispute.  Is it disputed or not?  You do not have to answer

24  now, you are going to go back and talk to him.

25         MR. SOLOWAY:  Right.

Proceedings                    85

1          THE COURT:  But that is one of the things I have to

2    resolve.  I can resolve it by the defendant saying, No, we

3    don't dispute that.  I can resolve it by the Government

4    saying, We don't need those numbers, we'll do other numbers.

5          I am not urging anyone to do anything, I am just

6    saying I have to resolve it.

7          MR. SOLOWAY:  It doesn't sound to me, I have to say,

8    that Mr. Schneider is disputing.  He's sort of making an

9    observation that doesn't necessarily directly dispute.  So if

10   you want me to --

11         THE COURT:  Well, it is not in the argument section

12   of the letter as to what the sentence should be, it is in the

13   objection section of the letter.  It says Objection, and then

14   it lists the paragraphs to which he is objecting.

15         It is fine, Mr. Soloway, if you want to tell me,

16   Well, we are not really objecting, we just want to make that

17   argument when it comes to sentencing.  You do not have to do

18   that now.

19         MR. SOLOWAY:  No, we don't.

20         THE COURT:  I am just saying if I get a letter from

21   a defense attorney saying, Here are my objections, I object to

22   paragraph 8; I have got to do something about that.  Okay?

23         Do not feel pressured to do it today.  Talk about

24   it.  Talk to each other.  Most of these things, when the

25   parties talk to each other, are usually resolved without a

Proceedings                                                86

1   Fatico hearing, but you have to talk because right now I have

2   objections.

3            Okay, paragraph --

4            MR. SOLOWAY:  I just want you to know that

5   Mr. Fuller is indicating that he wants to withdraw -- having

6   discussed it with him, he wants to withdraw the objections.

7            THE COURT:  Yes, your can.  That's fine.  Objections

8   deemed withdrawn.  So I am not going to resolve that.

9   Paragraph 8 stands.

10           Oh, he is withdrawing all the objections?

11           MR. SOLOWAY:  That's correct, Judge.

12           THE COURT:  Thank you very much.

13           Okay, with all the objections in Mr. Schneider's

14  letter having been withdrawn, are there any other factual

15  issues other than the incidents that we have just heard the

16  witness testify about and the medical condition on which I

17  need to take evidence?  Anything else?

18           Does the Government identify anything in dispute?

19           MS. PENZA:  No, Your Honor, not with the objections

20  withdrawn.

21           THE COURT:  Okay.

22           Mr. Soloway, do you need any additional time before

23  we determine that those are the only two issues that have to

24  be determined?

25           (Pause.)

Proceedings                                87

1          MR. SOLOWAY:  I would say, Judge, with the

2    objections withdrawn, and that's what Mr. Fuller wants to do,

3    that we are ready to proceed to -- did you have a specific

4    question that you had put to me about where we were going from

5    here, Judge?

6          THE COURT:  Well, I know where we are going from

7    here.  The purpose of today is for me to resolve any factual

8    issues.  I have heard testimony for the first time.

9          MR. SOLOWAY:  Right.

10         THE COURT:  I got exhibits for the first time.  I

11   got voluminous exhibits from you yesterday afternoon,

12   Mr. Soloway.  So I cannot resolve everything today, but if I

13   have got all the evidence I need to take, I am prepared to

14   schedule sentencing, at which time I will announce my

15   resolution of the two disputed factual issues that we have

16   identified and impose sentence.

17         MR. SOLOWAY:  Great.

18         THE COURT:  Does that sound right?

19         MR. SOLOWAY:  Yes.

20         THE COURT:  Okay.

21         Let's do, Melonie, October 6th?  What time?

22         THE COURTROOM DEPUTY:  October 6th at 9:30 a.m.

23         MS. PENZA:  I'm sorry, Your Honor, may I?  One more

24   request regarding the medical issues.

25         THE COURT:  Yes.

Proceedings                    88

1            MS. PENZA:  Given Mr. Soloway's submission

2    yesterday.

3            THE COURT:  Right.

4            MS. PENZA:  I would like the opportunity to speak,

5    especially to Dr. Toye.  I was hoping that the Court would

6    order that she be instructed to speak to me.  In light of

7    HIPAA considerations, I assume that she will not do so absent

8    a court order.  And so I would like the Court to order that

9    and I will engage in that promptly and inform the Court

10   whether there is any additional evidence the Government would

11   like to present on the medical issues.

12           THE COURT:  Well, that is an interesting issue.

13           Is defendant willing to consent to waiver of

14   physician/client privilege?

15           You do not have to tell me now.  Here is the

16   situation --

17           MR. SOLOWAY:  How about --

18           THE COURT:  Go ahead.

19           MR. SOLOWAY:  Can I confer with Ms. Penza for a

20   second, Judge?

21           THE COURT:  Yes.  We also take a ten-minute break,

22   if you want.  We can do anything you want.

23           MR. SOLOWAY:  No, I don't think we need ten minutes.

24           THE COURT:  All right, we will take a minute then

25   while you confer with her.

Proceedings                                    89

1          (Pause.)

2          MR. SOLOWAY:  I thought it was some other name, but

3    now I know who we're talking about.

4          Judge, Ms. Penza can talk to Amanda Toye about

5    Mr. Fuller's treatment.  He waives the privilege on that, the

6    physician/patient privilege, so go ahead.

7          THE COURT:  Okay.  Get me an order, I will sign it

8    if you can give it to her.

9          MS. PENZA:  Okay.

10          THE COURT:  And then talk.

11          MS. PENZA:  Thank you, Your Honor.

12          THE COURT:  Can we get that all done soon so we can

13    go forward on October 6th because I really want this done?

14          MS. PENZA:  Yes, I will have you the order today or

15    tomorrow.

16          THE COURT:  Well, more important than that, can you

17    have the conversation and get me something on it so that

18    Mr. Soloway also has a chance to respond to it if he wants to?

19          MS. PENZA:  Of course, as soon as she is available.

20          THE COURT:  So let's leave it on for October 6th at

21    9:30, and it is my intent to proceed with sentencing on that

22    day.

23          Anything else?

24          MR. SOLOWAY:  Wait, October 6th?

25          THE COURT:  Do you have a problem?

SAM      OCR      RMR      CRR      RPR

Proceedings                    90

1          MR. SOLOWAY:  No, no.

2          THE COURT:  October 6th at 9:30.  See you all then.

3          MS. PENZA:  Thank you, Your Honor.

4

5      (Matter adjourned.)

6

7

8

9                           ooo0ooo

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR