1

1           UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - X
3
    UNITED STATES OF AMERICA,      : 16-CR-254(BMC)
4                                  :
                                   :
5                                  :
        -against-                  : United States Courthouse
6                                  : Brooklyn, New York
                                   :
7                                  :
                                   : Wednesday, October 18, 2017
8   ROBIN FULLER,                  : 2:15 p.m.
                                   :
9           Defendant.             :
                                   :
10
    - - - - - - - - - - - - - X
11
            TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
12             BEFORE THE HONORABLE BRIAN M. COGAN
             UNITED STATES DISTRICT COURT JUDGE
13
                      A P E A R A N C E S:
14
    For the Government:   BRIDGET ROHDE, ESQ.
15                        United States Attorney
                          Eastern District of New York
16                            271 Cadman Plaza East
                              Brooklyn, New York 11201
17                        BY:MOIRA KIM PENZA, ESQ.
                              Assistant United States Attorney
18
    For the Defendant:    ROTHMAN, SCHNEIDER, SOLOWAY & STERN,
19                        P.C.
                              100 Lafayette Street
20                            Suite 501
                              New York, New York 10013
21                        BY:ROBERT SOLOWAY, ESQ.

22

23  Court Reporter:  Michele D. Lucchese, RPR
                     Official Court Reporter
24                   E-mail:  MLuccheseEDNY@gmail.com

25  Proceedings recorded by computerized stenography.  Transcript
    produced by Computer-aided Transcription.

1          THE COURT:  Good afternoon.  Be seated, please.

2          THE COURTROOM DEPUTY:  United States v. Fuller,

3     docket No. 16-CR-254.

4          Counsel, please state your appearance starting with

5     the Government.

6          MS. PENZA:  Moira Kim Penza for the United States.

7     Good morning, Your Honor.  With me at counsel table is Steven

8     and Mary Ann Betts from the United States Probation

9     Department.

10          THE COURT:  Good afternoon.

11          THE PROBATION OFFICER:  Good afternoon.

12          MR. SOLOWAY:  Robert Soloway for Robin Fuller.

13          THE COURT:  Good afternoon.  Good afternoon, Mr.

14     Fuller.

15          All right.  I understand there's a preliminary

16     issue.  I'm not sure why the Government didn't flag this for

17     me earlier, but the issue is that Ms. Fuller would like to

18     address the Court in connection with sentencing.  I take it

19     the Government is of the view that notwithstanding that she's

20     not the victim of the crime of conviction, she still has

21     standing to speak as if she is a victim?

22          MS. PENZA:  Your Honor, first let me address, I do

23     apologize for not bringing it to the Court's attention

24     earlier.  I only learned today that Ms. Fuller would like to

25     make a statement.  The Government would ask that Ms. Fuller be

3

1    able to make a statement pursuant to 18 U.S.C. 3661, which

2    provides that no limitation shall b placed on what the Court

3    may consider at sentencing.  And I point the Court to two

4    cases in similar circumstances where an impact statement from

5    a person who is not a victim of the charged crime has been

6    allowed to speak:  One was United States v. Weiner, which was

7    518, Federal Appendix 358.  That is a Sixth Circuit's case

8    from 2013.  And then the other would be *United States v.*

9    *Greig*, G-R-E-I-G, 717 F3 D212, and that is a First Circuit

10   case from 2013, Your Honor.  I do apologize for not bringing

11   this to the Court's attention sooner, but in those cases we

12   did have similar circumstances and given the nature of the

13   case, I believe that Ms. Fuller's statement should be

14   considered at sentencing.

15        THE COURT:  What is defendant's position?

16        MR. SOLOWAY:  For the reasons that Your Honor just

17   referenced relating to the issue of whether or not Ms. Fuller

18   is a victim of the crime that is the subject matter of this

19   proceeding and is the indicted crime, I am going to oppose

20   notwithstanding the broad language of 3661 because the Crime

21   Victims' Rights Act, which is Section 3771 speaks to the issue

22   of whether victims should be permitted to speak.  So I am

23   opposing it on those grounds.

24        THE COURT:  If she fell under the Crime Victims

25   Protection Act, then she would have the right to speak, I

4

1   would have to allow her to speak.  She's not protected by the

2   act.  She has no such right to speak; however, under the

3   statutes, I believe I can listen to anything that I want to

4   listen to and there is no limitation on what I can receive.

5   It is unfortunate that I am getting hit with this issue cold.

6   Let me just stay here a minute and take a look at the First

7   Circuit case.  The Sixth Circuit summary order and an

8   unpublished decision, I'm not sure if it helps me very much.

9          MS. PENZA:  I am happy to provide Your Honor with a

10  hard copy, if you'd like.

11         THE COURT:  No, I will pull it up.  Mr. Soloway, do

12  you have a copy?

13         MR. SOLOWAY:  Ms. Penza provided me with a copy --

14  you are talking about *Greig*, Your Honor.

15         THE COURT:  Yes.

16         MR. SOLOWAY:  And I also have a copy from Ms. Penza

17  of the Sixth Circuit's case, Kevin Weiner, which I just

18  received moments burn entered the courtroom.  I did have a

19  chance to scan them.

20         THE COURT:  I think I am going to need a hard copy

21  too because my computer is not responding.

22         I have been given a hard copy.  Let me look at it.

23         The First Circuit's case, the decision in *Greig* is

24  distinguishable on one ground at least, which is abundant

25  notice had been given to the defendant that the family member

1   was going to speak.  That's not the only basis on which the

2   decision was reached by the Court of Appeals, but just as I

3   feel kind of blindsided by learning of this today, and perhaps

4   the Government does too, more importantly, I think the

5   defendant is blindsided by it and that's not the way we are

6   supposed to proceed at sentencing.  As a matter of discretion,

7   I am therefore determining not to hear from Ms. Fuller.  I

8   will say having heard her testimony, I think I have a pretty

9   good idea of what she would say and I also know she said quite

10  a bit in the pre-sentence report, none of which at this stage,

11  because Mr. Schneider's objections have been withdrawn, are

12  challenged, so I don't really feel the need to hear from her,

13  and rather than complicate the proceeding or have to delay it

14  even further because of this last minute notice that the

15  Government and I got, we are going to proceed without hearing

16  from her.

17          Let's get on with the sentencing.  First of all, I

18  want to return to the Government the pictures of child

19  pornography with which the Probation Department furnished me

20  for purposes of considering them at the sentencing hearing.  I

21  am having my clerk hand them back to the Government.

22          Now, I have, of course, the Fatico hearing.  I have

23  the multiple submissions that the parties have made since that

24  hearing.  And based on, as I referenced before, the

25  defendant's withdrawal of Mr. Schneider's objections to the

6

1    PSR, I think there are only two factual issues that I need to

2    consider in this, the first is whether the defendant has

3    deliberately exaggerated or fabricated his medical condition.

4    That is relevant I think for 3553(a) purposes.  And second,

5    did the defendant have a sexual relationship with his daughter

6    either while she was a minor or after she became 18.   The

7    Government has the burden on both of those issues, has to

8    prove them in its favor by a preponderance of the evidence.

9           Now, as I said, the parties have put in a lot of

10   papers on these issues.  I have read it all.  If there is

11   anything additional that either side wants to say, I will hear

12   from you.

13          Anything from the Government?

14          MS. PENZA:  No, Your Honor.

15          THE COURT:  From defense?

16          MR. SOLOWAY:  You know, Judge, there are a couple of

17   things that I want to point out.  I don't write lengthy

18   submissions just to come in and rehash things.  There has been

19   a lot of paper.  You know, we had briefing that included three

20   Fatico legal issues and factual issues.  I really just want to

21   sort of articulate one thing, and that is that the positions

22   that I took in a letter that I wrote to the Court in July that

23   was at that time arguing that there would be a due process

24   issue were the hearsay statements of Ms. Fuller to be accepted

25   and credited by the Court for purposes of the disputed

7

1    guideline and the five-point enhancement.  I know that in the

2    letter that I most recently wrote to Your Honor in October I

3    did say that I incorporated all the arguments that I made

4    there and wanted to essentially reiterate.  But I do believe,

5    Your Honor, that I haven't really said some things that should

6    be pointed out.  So they are new.  Specifically, I recall part

7    of the testimony of Ms. Fuller included references to

8    something that, you know, I had never heard before at a Fatico

9    hearing, namely that there was an incident shortly after her

10   father's house was sold in April of 1997 and they began these

11   journeys, and she said that shortly after the house was sold

12   they went to this Arizona hotel where these incidents occurred

13   over a period of a couple of days.  My recollection is

14   something like three days, where there was no actual touching

15   involved but that the defendant was watching things and

16   directing her essentially to view him doing certain things.

17            If you recall, Judge, one of the main things that I

18   have tried to emphasize here is the lack of corroboration, the

19   lack of outcry, the lack of police reports, the lack of

20   credible accounts of corroboration of these things.  And one

21   of the things that Ms. Fuller testified to was that there came

22   a time that they went to Idaho who my client's girlfriend, she

23   identified as someone named Gerry was there in Idaho and

24   wanted to take Ms. Fuller with her away from Mr. Fuller but

25   indicated that she was underage, she would be exposed to the

8

1   possibility that Mr. Fuller would lodge some kind of kidnap

2   charges, something like that, and that is another person to

3   whom that Ms. Fuller claims to have had a relationship of

4   trust, a relationship of friendship.  And now we know that it

5   is allegedly after this Arizona incident, which occurs before

6   the California incident, because the testimony was that she

7   meets up with Gerry somewhere after the Arizona hotel happens

8   where she claims really for the first time with any specifics.

9   So the question becomes not only in general why there's no

10  outcry other than her mother, which has its own problem that

11  I'm not going to go through them again, and I referenced them

12  again in the July letter in terms of the discrepancies that

13  exist there.  She's with this person Gerry who she wants to go

14  with, away from Mr. Fuller, allegedly, and there's no

15  indication that she tells her about this incident that

16  happened.  So it is just another, in a long string of not just

17  what I consider to be very, very serious discrepancies and

18  inconsistencies in relation to the things that happened in

19  Washington, the things that were alleged to have been told to

20  the police, now a lawyer, the things that were alleged to have

21  obtained in the nature of restraining orders that there's

22  absolutely no records of, notwithstanding records of many,

23  many others things.  So I just wanted to point out that one

24  thing which I think is new and occurred to me after, Your

25  Honor, I wrote the latest October 3rd letter.  And that's it.

1          THE COURT:  Okay.  Any response from the Government?

2          MS. PENZA:  Yes, Your Honor.  Just briefly.  I do

3   want to just address in terms of an outcry witness, which I

4   think is a lot of what Mr. Soloway has been basing his

5   concerns about Ms. Fuller's testimony on.  I don't think that

6   there is any surprise that a 17-year-old girl wouldn't

7   immediately go and tell someone when this was happening to

8   her.  Her father, who was really, in her own description of

9   it, kept her in this constant state of mental abuse really her

10  whole childhood.  To hear Ms. Fuller describe it, when she

11  talks about the sexual abuse, to her that was a limited

12  instance and it -- all of the other abuse she suffered at his

13  hands, including watching her brother be physically abused,

14  that had a much greater impact on her life to the way she

15  views it and why she made the decision to cut off contact with

16  her father.  So I think when we talk about inconsistencies in

17  Ms. Fuller's testimony, I don't think it is surprising that a

18  woman who has spent her life making a life for herself, trying

19  to get away from this terrible childhood that she had that was

20  filled with all of this trauma, that when these issues came to

21  the surface again that she remembered things in bits and

22  pieces.  She didn't say that in Arizona something greater

23  happened than what she had already talked about happening in

24  California.  She gives very detailed specifics about the

25  sexual encounters and I think, if anything, during that

10

1    interview that we presented first, she minimized some of the

2    sexual behavior that was perpetrated on her.  In light of all

3    those things, I believe Ms. Fuller should be credited.  And

4    also all of the other statements she makes about her

5    childhood, there is plenty of corroboration for.

6            This whole childhood of Mr. Fuller making false

7    statements about being a veteran or being a member of the one

8    of the armed forces, that's all been borne out during the

9    sentencing process and the statements that he has made to

10   probation, for example, and the statements he made to Special

11   Agent Mullin.  All of the -- even in her childhood he was

12   feigning his disability and now we see that same thing

13   happening in the courtroom today.  All of those things I think

14   add to the credibility of Ms. Fuller's testimony and I don't

15   think any of the discrepancies that have been pointed out

16   point to somebody who is -- she testified that she remembers

17   clearly the instances of sexual abuse that she testify to.

18   There were four very clear instances progressing in magnitude

19   to ultimately her participating in masturbating him.  I think

20   that those should all be credited.

21           THE COURT:  All right.  Let me deal with the medical

22   issues first.  My finding on that is that this defendant does

23   not have the muscular dystrophy.  He is malingering for the

24   purpose of obtaining special treatment in sentencing.  It is a

25   continuation of a practice that he started for the purpose of

1  obtaining drugs and I think there is overwhelming evidence in

2  the record to support it.

3          First, other than his self-reporting of muscular

4  dystrophy, there is nothing in the record to corroborate it.

5  Second, he has made many inconsistent statements as to when he

6  developed muscular dystrophy.  He told his treating physician,

7  Dr. Anderson, that he was first diagnosed with it when he was

8  in the Ukraine as an adult, but there is evidence in the

9  record that at other times he has stated that he has had it

10  since he was five years old.

11          Very significant to me, he has refused to undergo

12  any testing at the MDC, which would prove or disprove his

13  claim of muscular dystrophy.  This procedure that they wanted

14  to do on him, it is not regarded as a particularly painful

15  test.  It is uncomfortable with minor pain at worse.  In fact,

16  there is no evidence at all in the seven-year span of medical

17  records that I have that he ever had a muscle biopsy or any

18  other test would have confirmed or refuted his claim of

19  muscular dystrophy.

20          Dr. Toy and Dr. Berchuck, who treated him prior to

21  his incarceration, both stated that he was fully ambulatory,

22  that he was not in a wheelchair and that in their opinion his

23  abilities were inconsistent with an adult having muscular

24  dystrophy.  Dr. Toy also told -- be quiet, Mr. Fuller.  Dr.

25  Toy also told the Government that the defendant had told her

1    that he had muscular dystrophy but she never treated him for

2    that, nor did she ever diagnosis him.  She also stated that

3    when he was with her, he was fully ambulatory.  She did

4    confirm that she prescribed pain medications but that these

5    were related to the spinal surgery that she did on the

6    defendant.  She also stated that she had implanted a pain pump

7    in his spine to control the dosage of his pain medications,

8    but shortly after it was implanted, he told her to take it

9    out, claiming that he was a scuba driver and an F-16 pilot and

10   that the pump interfered with these activities.

11         Now, number one, the doctor is not making that up.

12   That's what he told her.  Number two, the defendant was making

13   that up; he is not a scuba driver and an F-16 pilot.

14         And, finally, Ms. Fuller testified at the Fatico

15   hearing that in and around 1998 that he had to leave Idaho

16   because the defendant's doctors wouldn't sign his Social

17   Security forms.  She testified he told her that the doctor

18   said he was not disabled and he was just seeking drugs.

19   Everything I have seen here is perfectly consistent with all

20   of the other cases I have seen of drug-seeking tendencies.

21         I am not persuaded by the fact that Mr. Soloway has

22   offered me that he was found disabled and got Social Security

23   benefits.  I deal with a lot of Social Security cases and I

24   have seen too much in those cases, including the use of

25   patient-friendly doctors and an overburdened system, to think

1   that it is not possible to obtaining a disability ruling by

2   deceit and exaggeration, and I have not been given any Social

3   Security records or medical records showing a diagnosis of

4   muscular dystrophy other than through his reporting.

5           Now, I understand Mr. Soloway says well, even if he

6   doesn't have it, he is still sick.  We will talk about that as

7   well when it comes time, but for now I find that he was

8   malingering.

9           With regard to the sexual abuse issue, it is pretty

10  close, but I can't find that the Government has sustained its

11  burden of proving that he sexually abused Ms. Fuller when she

12  was a minor.  In her testimony, what Ms. Fuller did -- and

13  there is nothing wrong with it, it is perfectly understandable

14  -- she is piecing the timeline together circumstantially to

15  figure out how old she was, like seeing snow on the roads as

16  they went through the mountains.  But what we are talking

17  about here is a very confined period of a couple of months

18  between her 17th and 18th birthday.  There could have been

19  late snow or there are some mountains that always have some

20  snow and that's not enough to push me over the edge to find it

21  more probable than that.

22          As Mr. Soloway pointed out, there are some

23  inconsistencies in her testimony, like the Long Beach

24  restraining order.  Having said that, I don't have any doubt

25  that he had, in fact, had a sexual relationship with her.  I

14

1   found her thoroughly credible as to that aspect of her

2   testimony.  Her testimony about the sexual abuse is specific

3   and really quite bizarre.  A person is not going to make up a

4   strange inclusion of a shoe string if all she wanted to do was

5   incriminate her father.  If she wanted to make something up,

6   she could make up a more believable routine story of abuse.

7   She really would have been more definite as to the age.  She

8   knew what it meant to establish firmly that she was 17 and yet

9   she didn't.  She circumstantially pieced it together instead

10  of telling a story that might have been one that I might have

11  accepted.

12          Her testimony at the Fatico hearing, I think there

13  are a couple of differences, but it was largely the same as

14  her taped interview with the FBI agent a couple of months

15  prior to her in-court testimony.

16          I also thought she really attempted to downplay the

17  gravity of the incident while testifying.  It did not strike

18  me as this is somebody out to get the defendant.  Her demeanor

19  on the stand showed me she was telling the truth.  She seemed

20  uncomfortable and often somewhat detached.  She didn't get

21  emotional or try to persuade me that her father was a bad guy.

22  And as the Government points out, her testimony that the

23  defendant would purchase military uniforms and pretend to be a

24  veteran, that is amply corroborated by this record.  This

25  defendant has lied to everyone mentioned in the record about

15

1   that fact, from Mr. Tim where he used it to grift free room

2   and board, to his doctors, to everyone he spoke to.  So it is

3   thoroughly corroborated as to that.

4         He even carried this military fantasy to an

5   allegedly deceased wife who he told probation was shot down

6   over Afghanistan while flying for the Ukrainian Air Force,

7   even though there is no record of any woman being killed in

8   Afghanistan in military circumstances.

9         Now, as far as Mr. Soloway's complaint about the

10  lack of corroboration, I don't think that is at all unusual in

11  cases of essentially non-consensual sex even she was over 18

12  at the time.  It is clear to me from this record that he

13  totally dominated his children and kept them in a constant

14  state of discomfort and fear.  So I am not going to apply the

15  sentencing enhancement in guidelines 2G2.2(b)(5).  I will,

16  however, take his conduct with his daughter into account to

17  the extent that it informs the 3553(a) analysis.  So those are

18  my findings on the only facts that I think were in dispute.

19        As to any other facts, I accept the unobjected to

20  portions of the PSR, Sections A and C describing the offense

21  and the offender characteristics.

22        Now, having established that factual basis for

23  proceeding here today, let's talk next about the guidelines.

24  I think we are in agreement -- first, I will note that the

25  guidelines are merely advisory and only one factor for me to

16

1    consider in determining the appropriate sentence, but I think

2    those guidelines come out to an offense level of 28, a

3    Criminal History Category of one and a sentencing range of 78

4    to 97 months.  Does anyone dispute that?

5              MR. SOLOWAY:  I think it is 78 to 87.

6              MS. PENZA:  No, it is 97.  You wrote it incorrectly,

7    I believe.  I think Mr. Soloway wrote it incorrectly in his

8    last submission.

9              THE COURT:  I have the chart.  It is 97.

10             MR. SOLOWAY:  If I wrote it incorrectly, that

11   doesn't get me anywhere, right?

12             THE COURT:  I'm afraid not.

13             That is my finding on the guidelines.  Let me then

14   hear from the parties as to all of the factors under 3553(a).

15   I will start with you, Mr. Soloway.

16             MR. SOLOWAY:  I want to raise an issue that I know

17   Your Honor has sort of previewed in your preliminary remarks

18   that relate to my client's medical history, something that you

19   said might be talked about later.  I have indicated in the

20   submissions that I have made whether or not my client has, in

21   fact, established muscular dystropy, which I just pointed out

22   in passing, Ms. Zeilstrof, his ex-wife in paragraph 53 of the

23   PSR said he does have.  I am sure Your Honor has noticed that.

24             THE COURT:  And he has told everybody that.  He has.

25             MR. SOLOWAY:  Yes, Judge.  He has, from the medical

1  records that we have, an established illness relating to

2  coronary issues which was corroborated not just by medical

3  records from the hospital in Las Vegas but also from Dr.

4  Anderson, who the MDC physician spoke to and was specifically

5  told that he has coronary disease and five stents placed.

6       It is certainly true, Your Honor, that my client has

7  been ambulatory.  I mean, he walked in the airport, as the

8  Government has established the day he was first detained when

9  they took his devices, not when he was arrested, but when he

10 was first detained, and now he is not ambulatory.  He is in a

11 wheelchair.  That doesn't mean that he's not sick.  He is over

12 60 years old, which doesn't mean that he has to be sick, by

13 any means, but he has a confirmed history of serious back

14 issue, coronary issues.

15      The back issues, I believe we only have records of

16 one spine surgery, but I saw references to him having two back

17 surgeries during his lifetime in some of the records.  So he

18 is in a lot of pain.

19      As Mr. Schneider pointed out in his records, there

20 have been references to the inability of the BOP to maintain,

21 and these I think came from Dr. Ross at Kingsbrook Jewish

22 Medical Center, the many times that he was referred there for

23 treatment for various problems, as recently as September.  He

24 was there for chest pains in September and I actually had a

25 conversation with Dr. Ross about that.  But there was nothing

18

1    to write about.  He came in and was discharged five days

2    later, as late as September.  And Dr. Ross, on the record, is

3    saying that he really can't be maintained very well at the BOP

4    and he's going to suffered much harsher conditions of

5    confinement by virtue of his medical issues than would the

6    average inmate, and that is something under 3553 that the

7    Court may consider.  It is going to be a very, very tough road

8    for him.

9            Now, I know Your Honor has made a finding not that

10   the enhancement applies with respect to the Fatico issues that

11   we dealt with specifically relating to the disputed five

12   points, but it really remains the case that, as identified at

13   rather great length by Mr. Schneider, the guidelines, even

14   according to the Sentencing Commission for this offense, are

15   to the view of many courts somewhat not indicative of true

16   culpability, and factors like whether or not a person has

17   engaged in sexually dangerous activity, I think it's

18   characterized, as were argued by Mr. Schneider, as well as the

19   kind of course not all collectors are pedophiles.  That issue

20   has become muddied, obviously, even though Mr. Schneider wrote

21   his letter to the Court after the PSR came out and was aware

22   of, at least at that time, the allegation from Ms. Fuller.

23   But I would argue that while a lot of the history and the

24   characteristics of the defendant that have come out through

25   this protracted sentencing proceeding have not in any way been

1    very helpful to Mr. Fuller's -- to the view of Mr. Fuller as

2    at least expressed by his family, and also by some police

3    officers who have encountered him in Washington, where he

4    went.  I mean, there are many -- I am sure Your Honor has read

5    those reports which were made part of the record in the

6    Fatico.  But it is still the case that Mr. Fuller, who had

7    these images on his device and has this issue literally from

8    the mid 1990s with respect to his daughter, which I really

9    don't mean to minimize in any way, is a 63-year-old man, in

10   Criminal History Category I with no criminal record, with

11   suggestions in the past that he has committed different kinds

12   of fraud but has -- other than what has come out through

13   family members during, again, this sentencing proceeding, no

14   record whatsoever of ever committing any acts of violence

15   against anybody, committing any serious crimes of violence,

16   has never -- other than these kinds of scrapes with the law,

17   which, again, passing bad checks have been suggested, things

18   like that, seeking drugs.  He has documented painful

19   conditions over the course of his life.  Figuring out what is

20   a reasonable sentence and a sentence that is sufficient but

21   not greater than necessary to deter Mr. Fuller, who has never

22   been in prison, apparently, a day in his life and now is going

23   to go through and now has been since obviously his arrest in

24   this case, he -- the issues of what will deter him, what will

25   be sufficient, all of the 3553 Factors call for in this case

20

 1   of Criminal History Category I, I think a sentence at the

 2   bottom of the guidelines or below.  That is my position.

 3           I know Mr. Fuller wants to speak.  Unless Your Honor

 4   has any questions for me, I really have nothing else to add.

 5           THE COURT:  Thank you, Mr. Soloway.

 6           Mr. Fuller, I will hear from you.

 7           THE DEFENDANT:  I understand you made whatever you

 8   call it, a ruling, a finding about my medical history.  Your

 9   Honor, in 1984, after a heart attack on the sports fishing

10   boat in San Diego, I was taken to Cabrio Hospital in San

11   Diego.  The doctors found that I didn't have a heart attack

12   because there was one enzyme in their cardiac enzymes was

13   missing.  But my employer wouldn't let me back to work.  I was

14   working on a classified project for the U.S. Navy by my

15   employer, Planning Research Corporation.  Their records still

16   exist.  They forced me to continue going to doctors until they

17   could find out what was wrong with me to know that I would be

18   safe to work on San Clemente Island, a Naval preserve off the

19   coast of San Diego in Los Angeles.  I was found and directed

20   to a doctor at UCSD Medical Center by the name of Richard

21   Haas, H-A-A-S.  This man took two years, did a number of

22   muscle biopsies.  I still have the scar on my leg.  The

23   biopsies were taken as far as Israel and into Germany.  They

24   wrote articles on it that are still available on the internet.

25   In 1985, they made their diagnosis and filled out forms for

1   Social Security and submitted for my disability, 100 percent

2   disability.  Social Security, as I'm told they normally do,

3   routinely refuse this the first time, asked for more

4   information.  And in 1986, Social Security found that yes,

5   indeed, I met all of their requirements.  They had shown the

6   muscle fibers.  They had shown the biopsies.  They had shown

7   my blood work.  And for the entire time, despite Nanette's

8   testimony that people say that they refused to sign my form,

9   never has any doctor refused to sign my form.  Year after year

10  after year they were submitted to Social Security signed by

11  legitimate doctors all over the west.  Social Security has

12  never questioned.  And after ten years, they dropped.  They

13  have never again asked me to submit a form.

14          Doctors do not always listen carefully when you are

15  talking to them, especially emergency room doctors who are not

16  trained in specialized diseases.  The fact that Dr. Toy said I

17  didn't treat you for muscular dystrophy is absolutely correct.

18  I was sent to her as a reference from Dr. Berchuck after my

19  spinal surgery.  It doesn't mean that I don't have muscular

20  dystrophy.  It means she simply failed to seek the records

21  that she should have done.  She knew that I was there as a

22  muscular dystrophy patient.  Everyone in the office knows

23  that's what I was there as.  And the simple truth is ask any

24  specialist in neurological diseases, like I have, they will

25  say you cannot treat muscular dystrophy, you treat the

1    symptoms of muscular dystrophy.  So, yes, these doctors

2    starting way back, and actually in 1972, started giving me

3    muscle relaxers and pain medicines when they didn't even know

4    what I had.  By 1986, with the final diagnosis, these doctors

5    continually prescribed them and I've been on them continuously

6    since 1984.  No doctor has ever refused to prescribe them for

7    me.  There's no record with any state DEA or the federal DEA

8    that I've ever abused the drugs.  I take them because the

9    doctors prescribe them to relieve the conditions I have.

10            As to -- for me, the issue of malignant lingering,

11   the statement from these people that I walked into the

12   airport, that's absolutely right.  I had medicines at the

13   time, my muscle relaxers and my pain medicines, and from

14   getting off the airplane and all of the airlines that I travel

15   on have me registered as a  disabled person requiring a

16   wheelchair.  They wheel you up to the customs line.  You have

17   to get out and stand in line and go through customs. So, yes,

18   I walked; I did what I had to do.  At that time I could still

19   walk 10, 15 feet without too much problem.  If I had something

20   to lean on, handrails in various places or a table, I could

21   stand for maybe five minutes.  The problem is is during this

22   period of time after being stopped at the airport in March of

23   2016, I've had no medicines.  So my condition, which is a

24   degenerative, progressive, terminal disease has progressed.  I

25   have gotten steadily worse.  I can no longer stand.  I can no

23

1    longer walk.  I'm confined to the wheelchair.

2           My hope is if I would be able to be released that I

3    would be able to go on to Dallas for the scheduled surgery

4    with Dr. Berchuck to remedy what he did to me back in 2014 and

5    that's nip a nerve in my right leg and in my spinal section

6    where he put the rods in.  He hoped to correct that.  That's

7    what I came here for specifically.

8           Now, I would like to say one thing.  What is

9    mentioned here continuously is family.  Unfortunately, I am

10   crippled by the fact that in March of 2014, Mr. Putin invaded

11   my home in Crimea.  My family, the people that I consider as

12   family are all trapped there.  The person who wrote the e-mail

13   that you have that they used as a reason to stop me, my

14   granddaughter, Malina Lori Fuller, who at the time was 19, is

15   still in Crimea.  I'm crippled by the fact that I can't get

16   anybody to come here to defend me.  I have no living relatives

17   in the United States, no one here to help me.  My only people

18   that could be testified are inside of Crimea and unable to

19   come to testify.  My reputation has been repeatedly slandered.

20   I have had nobody to stand for my side of the story.  You

21   know, I feel extremely insulted just because this -- I have

22   forgotten her name now.  Ms. Main, I think it was, that took

23   down the notice, who wrote down a paraphrasing of what I said

24   about my wife Irena.  Irena was flying one of our

25   company-owned airline planes, a cargo plane over Afghanistan.

24

1  She was shot down by an American-made Stinger missile.  There

2  are records of it all over Europe.  To say that she doesn't

3  exist or Ms. Main's translation into that that she was flying

4  for the Ukrainian Air Force.  My wife had been a Soviet pilot

5  in her youth, but when the Soviet Union broke up, she wounded

6  her airline and she was a pilot for that system.  Those

7  records are still available in Crimea.  They're still

8  available in Kiev, Ukraine.  My trips back and forth, my

9  family, my flat that I still owe 20 months of back lease

10  payments on the flat in Odessa, they're all available

11  overseas, but they are not available to defend myself here in

12  this country.

13          I have never feigned an illness.  That information

14  -- I would much rather have been able to work.  I earned over

15  $64,000 a year in 1984 and I did $1,200 a month ever since

16  Nanette and her mother managed to get my third-party

17  disability cancelled there in Idaho by their claims that there

18  was nothing wrong with regard to me.  Social Security and the

19  Federal Government has consistently said yes, there is

20  something wrong with you, your medical records show it.  You

21  have been treated for it for 58 years.  To say I don't have

22  it and just because people like to change what they hear,

23  doesn't make it so that I don't have it.

24          THE COURT:  Okay.

25          I will hear from the Government.

1          MS. PENZA:  Your Honor, just very briefly, I am not

2     going to further discuss the claims of muscular dystrophy as

3     it was reported in the findings.  I will state that in

4     speaking to Dr. Berchuck there was no scheduled surgery

5     planned.

6          The one thing I do want to raise, which we do have

7     voluminous briefing in this case, but this is somebody who,

8     despite having had no criminal history, has spent his life

9     committing crimes and he has been -- and the concern is that

10     he spent his life terrorizing people who are more vulnerable

11     than he is.  I think that is part of the charged conduct here.

12     We see these are girls who -- the images of the girls that he

13     had and was distributing as part, although he was only

14     convicted of possession, although there was distribution

15     there, every time their images are distributed, they're

16     victimized over and over again, and then his own daughter and

17     his own son and his ex-wife.  This is somebody who I think

18     there is very serious concerns about recidivism and he has

19     lived a life of violence and a live of lies.

20          THE DEFENDANT:  Your Honor?

21          THE COURT:  Very briefly.

22          THE DEFENDANT:  Yes.  I didn't think of all of this

23     at the time.  My daughter conveniently refuses to say to

24     anybody that at the time she claims this stuff was happening

25     she was never ever alone.  My father and my mother raised her.

1    When my mother finally died, Nanette took great offense to my

2    marriage to the Russian woman, Irena Savrinskaya.  The person

3    that she identifies as my girlfriend, Gerry, was, in fact,

4    Nanette's friend.  She was someone we met at the bowling alley

5    up in Chandler, Arizona known as Kyrene Lanes.  Nanette took

6    to her and her friend.  Gerry was there living with us in the

7    house in Arizona before my mother died, after my mother died.

8    My wife Irena was living with us.  Nanette had ample

9    opportunity if she believes these things happened -- they are

10   total fantasy -- that she could have told somebody.  Gerry

11   drove with us, as did my wife, to Idaho.  Gerry then left.

12   There was no relationship between me and Gerry other than as

13   friends, who my daughter met at the bowling alley and we all

14   became friendly.  But I was married.  There was no way

15   anything was going to be going on.  The implication that I

16   spent an entire life terrorizing people.  My daughter was

17   provided with the best of everything.  She insists on saying

18   we stayed at cheesy motels.

19          When my mother's house was sold, we didn't stay at a

20   hotel.  I got the settlement from the title agent and my real

21   estate agent and we immediately got in the Jeep Grand Cherokee

22   we had and drove to Las Vegas.  There's pictures on that

23   computer of that trip.  We went on directly to Idaho where we

24   had an apartment where all of us lived.  Nanette was bought

25   scuba diving lessons.  That's where the story about the scuba

1   and the F-16 is.  It's always been a joke.  I bought Nanette

2   scuba diving lessons.  At that time, in 1998, I could still

3   scuba dive, shallow depths.  But she wanted to become a Sea

4   World trainer.  I spent thousands and thousands of dollars on

5   this young woman trying to get her happy, but she would not be

6   happy.  She didn't like Irena.

7              THE COURT:  Mr. Fuller, I need you to conclude,

8   please.

9              THE DEFENDANT:  Okay.  The pictures on that computer

10  are the property of my granddaughter Malina Lori Fuller and

11  her cousin, my granddaughter, Yullia Emily Kolishikova.  The

12  computers are registered in their names with Apple.  They have

13  their own folders, their own logins.  I was simply

14  transporting the computer to the U.S., the hard drive, the

15  external hard drive because it was failing.  I promised to get

16  it fixed for them.  None of this belongs to me.  I see no

17  violence in any of it.

18             The episode with Eric is a total lie.  The records

19  of Pinal County Sheriff show he was never abused.  In fact, he

20  assaulted my mother from which she died four months later and

21  they took him away.  I did nothing to him.  There's no record

22  of it.

23             THE COURT:  All right.  Thank you, Mr. Fuller.

24             I have considered all of the applicable factors

25  under 3553(a), including the sentencing guidelines, the first

1    factor in the statute is the nature of the crime and the

2    circumstances of the offense.  It is child pornography.  There

3    is not an ounce of remorse.  There is continuing denial.

4    These children in these pictures, which I am forced to look

5    at, shows them effectively being tortured.  Instead of owning

6    up like some of my defendants who have a problem with this

7    kind of material do, Mr. Fuller continues to disclaim any

8    involvement at all.  That makes it a crime of the utmost

9    seriousness and the circumstances of the utmost aggravation.

10            The second factor in the statute is the history and

11   characteristics of the defendant.  This is obviously a unique

12   character I am dealing with and I do not mean that in a

13   positive way.  I am not seeing any substantial mitigating

14   factors in his character.  He is liar and a grifter of epic

15   proportions.  He has made up the most outlandish stories, even

16   if I start with what he has just told me.  You know, he has

17   had two of the best sentencing lawyers that this district has

18   and I don't have an ounce of anything to back up what he told

19   me.  I have defendants from foreign countries.  I have

20   defendants from China who get me things to back up what they

21   are saying.  I have nothing now, as the doctors never had, but

22   Mr. Fuller's statement.

23            It is part of my job to judge con men and I am

24   dealing with one here.  And like any con men doing the long

25   con, Mr. Fuller has convinced himself.  It doesn't make it

29

1    true.  It doesn't make any of it true.

2         Telling the probation officer that he has 24

3    children, including 17 from his marriage to Rienna.  They

4    adopted 14, but he couldn't recall their names, that he

5    married one of his ex-wife's sisters after they were divorced,

6    and that one of his ex-wife's, he says the probation officer

7    misheard, was not a combat pilot but was flying a cargo plan

8    over Afghanistan when she was shot down.  It's nonsense.  I

9    accept none of it.  It makes it worse that Mr. Fuller will not

10   acknowledge that he has been exposed.

11        As far as the emotional abuse of children, I have no

12   doubt whatsoever.  Ms. Fuller's testimony on this establishes

13   that he physically abused his son.  She described how she was

14   controlled, not allowed to participate in school activities or

15   sports or even allowed to have friends.  I don't know, maybe

16   he did spend thousands for scuba diving lessons, but if he

17   did, that's because he wanted to, not that he wanted her to do

18   what she wanted to.  Teaching her that she should be seen and

19   not heard, that he once used a belt on her brother.  I find it

20   all entirely credible.

21        As to the medical history, which Mr. Soloway has

22   tried his best to salvage, yes, he may have something, but

23   when I am dealing with someone who so easily fabricates

24   medical conditions and tells doctors things that are

25   inconsistent and untrue, I can't ascertain what it is, I can't

1   ascertain the seriousness.  Yes, there are all these medical

2   records back before 1984 and somehow the two lawyers who are

3   really good lawyers, they can't find them.  Just like oh, it

4   is Mr. Putin's fault for invading the Ukraine and, therefore,

5   we can't get any evidence out off the Ukraine.  I have had

6   evidence out of the Ukraine.  There are ways to do it.  It's

7   not even that hard.

8           The next factor I have to consider is respect for

9   law.  Mr. Fuller has zero respect for law, not at all uncommon

10  with narcissists.  They come first; the law comes second.  The

11  law is just something that gets in their way from time to

12  time.

13          The next factor is specific deterrence.  I agree

14  with the Government that because Mr. Fuller has no respect for

15  the law, because he is a con man who has convinced himself of

16  the con, he is going to do whatever he wants, whatever

17  sentence I impose.  There is no deterring a person like this.

18          And as far as the guidelines in child pornography

19  cases sometimes being excessive, they often are.  They are not

20  here.  This is a situation that the guidelines really were

21  meant to address.  If there is a problem in the guidelines is

22  that they treat this situation as the mainstream when, in

23  fact, this is not at all mainstream, but it falls squarely

24  into what the guidelines were contemplating, a very totally

25  depraved individual who has no connection with the moral

1   standards that govern society.

2       Based on those and the other sentencing factors in

3   3553(a), I sentence the defendant to 97 months custody,

4   supervised release of five years with the following special

5   conditions:  Registry as a sex offender as required by federal

6   and state law.  Participation in mental health treatment

7   programs, including treatment for sexual disorders.  He has to

8   pay for those to the extent that he is able to and he has to

9   make disclosure to probation of all finances that he has.  He

10  has to undergo polygraph examinations where directed.  He

11  shall not associate with other convicted sex offenders.  He

12  will not associate with any children under the age of 18

13  unless a responsible adult is present and he has prior

14  approval from the Probation Department.  If he lives with

15  anybody who has minor children, he must inform that person

16  that he is a convicted sex offender.

17      In addition, any residence, employment and volunteer

18  work he undertakes will be approved by the Probation

19  Department.  He will not reside anywhere where minor children

20  reside or work for any business that has anyone under 18

21  working there without the permission of the Probation

22  Department.

23      I will also impose a search condition giving the

24  Probation Department, upon reasonable suspicion of contraband,

25  to enter anyplace where he lives, works, frequents or any car

1    that he drives.  He can have access to a computer, but he may

2    not access pornography of any kind, pornography including

3    sexually explicit conduct.  He shall not view any pictures of

4    naked children.

5           He shall cooperate with the U.S. Probation's

6    Department of Computer and Internet Monitoring Program.  He

7    will identify any computer or internet accessible devices that

8    he has.  He will not go to any dating websites or anything

9    else that seeks to match people together for establishing

10   personal relationships.

11          He has to utilize one pharmacy and only one pharmacy

12   for all prescription medications.  He shall use only one

13   physician for all prescription medications if those

14   medications are opiate-based.

15          In addition, he will not possess any firearm,

16   ammunition or destructive device.

17          Those are the conditions of supervised release.

18          I will not impose a fine because if we accept his

19   financial statement at face value, which I guess we have to

20   do, he cannot afford a fine.  I will impose the mandatory $100

21   special assessment.

22          Open counts?

23          MS. PENZA:  Your Honor, I believe there is one open

24   count.

25          THE COURT:  I believe so too.

33

1          MS. PENZA:  The Government moves to dismiss Count

2    One of the indictment.

3          THE COURT:  The motion is granted.

4          If Mr. Fuller wants to appeal his sentence, he has

5    waived his right to appeal his conviction by pleading guilty.

6          Does his plea agreement contain an appeal waiver?

7          MS. PENZA:  It does.  It is 108 months.

8          THE COURT:  So he has waived his right to appeal his

9    conviction and his sentence, but if he nevertheless wishes to

10   contend there is something fundamentally unfair with any

11   aspect of these proceedings, includes his conviction and

12   sentence, he must get a notice of appeal filed within 14 days.

13   Mr. Soloway can file that, the clerk will file it.  If Mr.

14   Fuller certifies that he cannot afford a lawyer or he can file

15   the one-page form himself.  But no matter how he delegates it,

16   it remains his responsibility to see to it that it gets filed

17   within 14 days, because if it does not, he will have no

18   opportunity to appeal whatsoever.

19         Anything further?

20         THE PROBATION OFFICER:  Yes, the Probation

21   Department wanted to see if the Court would be interested in

22   imposing, it's a new special condition for electronic

23   communication service accounts, such as clouds and e-mail

24   services.  May I read the condition to Your Honor?

25         THE COURT:  Please.

34

1          THE PROBATION OFFICER:  The defendant shall report

2     to the probation office any and all electronic communications

3     service accounts as defined in 18 U.S.C. 2510, Subsection 15,

4     for user communications, dissemination and/or storage of

5     digital media files.  This includes but is not limited to

6     e-mail accounts, social media accounts and cloud storage

7     accounts.  The defendant shall provide each account identifier

8     and password and shall report the creation of new accounts,

9     changes in identifiers and/or passwords, transfer, suspension

10    and/or deletion of any account within five days of such

11    action.

12          THE COURT:  Granted.

13          THE PROBATION OFFICER:  Thank you.

14          THE COURT:  Anything else?

15          MR. SOLOWAY:  Just a recommendation.

16          THE COURT:  What are you asking for?

17          MR. SOLOWAY:  Somewhere in the -- well, he is

18    specifically asking for designation to a facility in Fort

19    Worth, a BOP facility in Fort Worth, Texas.

20          THE COURT:  Would he rather have Texas or a medical

21    center?

22          THE DEFENDANT:  It is a medical center in Texas.

23          THE COURT:  I will recommend that he be evaluated,

24    as the BOP does in any event, and if appropriate, assigned to

25    a medical center in Texas.

35

1          Thank you.  We are adjourned.

2          MS. PENZA:  Thank you, Your Honor.

3                    *     *     *     *     *

4     I certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.

5

6      /s/ Michele D. Lucchese              December 11, 2017

7     _____    _____
           Michele D. Lucchese                  DATE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25